# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3394

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Keith A. Va Lerie, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: April 12, 2005
Filed: October 3, 2005

_____

Before LOKEN, Chief Judge, McMILLIAN, WOLLMAN, ARNOLD, MURPHY,
BYE, RILEY, MELLOY, SMITH, COLLOTON, GRUENDER, and BENTON,
Circuit Judges, en banc.

_____

RILEY, Circuit Judge.

Keith Va Lerie (Va Lerie) was charged with possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1), after members of the Nebraska State Patrol (NSP) discovered cocaine inside Va Lerie's checked luggage at a Greyhound bus station. The district court granted Va Lerie's motion to suppress evidence, including the cocaine, concluding (1) the NSP unlawfully seized Va Lerie's checked luggage by removing it from the bus and to a room of the bus terminal to seek Va Lerie's consent to search the luggage; and (2) Va Lerie's apparent consent to a search of his luggage did not remove the taint of

the unlawful seizure. This appeal primarily asks whether the NSP's removal of Va Lerie's checked luggage from the bus's lower luggage compartment to a room inside the bus terminal to seek Va Lerie's consent to search the luggage constituted a Fourth Amendment seizure. Reversing the district court's seizure decision, we hold such conduct did not constitute a seizure, because the removal of the luggage did not (1) delay Va Lerie's travel or significantly impact Va Lerie's freedom of movement, (2) delay the timely delivery of the checked luggage, or (3) deprive Greyhound of its custody of the checked luggage. This appeal secondarily asks whether Va Lerie voluntarily consented to a search of his luggage. We conclude he did. Therefore, we reverse the district court's decision granting Va Lerie's motion to suppress, vacate its suppression order, and remand for proceedings consistent with this opinion.

## I.     BACKGROUND

On December 23, 2002, Va Lerie was traveling on a Greyhound bus from Los Angeles, California, to Washington, D.C., when the bus stopped around noon for refueling at the Greyhound station in Omaha, Nebraska. During refueling and cleaning, Greyhound required its passengers to get off the bus and wait inside the bus terminal. NSP Investigator Alan Eberle (Investigator Eberle) was performing drug interdiction duties at the Greyhound station when Va Lerie's bus stopped for refueling. During the refueling, Investigator Eberle looked inside the bus's lower luggage compartments, and he found a newer piece of luggage displaying a baggage ticket with Va Lerie's name, but no telephone number or passenger name tag. When Investigator Eberle went to the rear baggage terminal to run a computer check of the luggage's claim number, he discovered the passenger had paid cash on the day of travel for a one-way ticket to Washington, D.C. Investigator Eberle asked a fellow law enforcement officer to remove the luggage from the bus and take it to a room inside the rear baggage terminal. Law enforcement removed the luggage from the bus and took it to the rear baggage terminal to seek the passenger's permission to search the luggage, as opposed to bringing the passenger to the bus in the refueling area, because "Greyhound does not want to have passengers walking over by the refueling

area." Even though law enforcement took the luggage to the rear baggage terminal, Investigator Eberle testified the luggage "was not in our custody[, but] was still in Greyhound's custody."

Investigator Eberle then paged Va Lerie, who approached the ticket counter. Investigator Eberle, wearing jeans, a t-shirt and a winter coat, displayed his badge, identified himself as a law enforcement officer, and informed Va Lerie he was not in trouble or under arrest. After Va Lerie agreed to speak with Investigator Eberle, Va Lerie displayed his bus ticket and identification, which matched the information on the luggage which had been removed from the bus. Va Lerie then agreed to follow Investigator Eberle to a room in the rear baggage terminal where Va Lerie's luggage was being held. The room had two open doors, and one or two other officers were already inside the room. Va Lerie confirmed the luggage belonged to him. Investigator Eberle then declared he was a narcotics investigator who was watching for people who might be transporting illegal drugs. When Investigator Eberle sought permission to search the luggage, Va Lerie made an affirmative verbal response to the request for consent to the search. After Va Lerie verbally consented to a search of his luggage, another officer took approximately one minute to execute the search. During the search, Va Lerie never objected, but he claimed the luggage actually belonged to a friend. Law enforcement discovered five vacuum-sealed bags containing cocaine inside Va Lerie's luggage.

Va Lerie was charged with possession with intent to distribute 500 grams or more of cocaine. 21 U.S.C. § 841(a)(1)-(b)(1). In two separate motions, Va Lerie moved to suppress the evidence discovered from the December 23 search, arguing the search violated the Fourth Amendment because (1) the search was conducted without a search warrant, and (2) Va Lerie did not knowingly, intelligently, and voluntarily

consent to the search.[1] Nothing in Va Lerie's motions claimed his luggage had been unlawfully seized when the luggage was removed from the luggage compartment to the rear baggage terminal.

At the beginning of the suppression hearing in front of a magistrate judge, Va Lerie's attorney stated, "With respect to [the motions to suppress], Judge, very simple. Question of consent, no consent. Bus stop." The government agreed "[t]he issue on the search is simply whether . . . consent exists or doesn't exist." During the suppression hearing, Va Lerie's attorney implied, for the first time, he also was arguing an unconstitutional seizure occurred. At that point, the magistrate judge informed Va Lerie's attorney his suppression "motion deals with a search of the bag and probably not the seizure of the bag." Va Lerie's attorney replied, "That's not the input. It's a Fourth Amendment violation. I'm not restricting it to–he never consented to that being–that bag being seized and searched." At that point, the magistrate judge allowed Va Lerie to expand his motion to suppress to include an unconstitutional seizure argument.

With the seizure issue before the court, the magistrate judge repeatedly asked Va Lerie's attorney to explain how "the relocation of the garment bag" from the lower luggage compartment to a room inside the terminal, in compliance with Greyhound's request not to take passengers to the refueling area, constituted a seizure under the Fourth Amendment. Va Lerie failed to provide the judge with authority supporting his position. The government then asked the judge to force Va Lerie "to establish some case law that I could respond to that somehow makes this removal of the bag from the bus in the cleaning area to the baggage room to present it to its owner is a constitutional violation." Va Lerie's attorney failed to respond to the government's plea for authority to support the seizure contention. The magistrate judge then gave

---

[1]Va Lerie also moved to suppress statements he made on December 23. The district court suppressed those statements, and they are not an issue in this appeal.

-4-

the parties opportunities to file post-hearing briefs, which only the government filed. Noting Va Lerie did not file a brief and never cited a single authority supporting his seizure position, the government noted it did not know of any authority supporting Va Lerie's seizure argument. Thus, the government focused its argument on the consent-to-search issue. Nonetheless, the government maintained "there is no constitutional issue in the officers removing the bag from the bus in the cleaning area to the baggage room which procedure was the one Greyhound, the bailee of the bag, had asked the officers to follow."

The magistrate judge determined the removal of Va Lerie's luggage to a room inside the rear baggage terminal was not an unreasonable seizure under the Fourth Amendment because (1) Investigator Eberle had "the requisite level of reasonable articulable suspicion in order to briefly detain the bag," and (2) "the removal of the bag was done in accordance to an understanding between Greyhound and the NSP to prevent passengers from walking into the refueling area." After judging the credibility of both Va Lerie and Investigator Eberle, the magistrate judge concluded Va Lerie voluntarily consented to the search of his luggage. In support of this conclusion, the magistrate judge found (1) Va Lerie, a 37-year-old with three years of college education, verbally consented to the search; (2) Va Lerie understood Investigator Eberle's questions; (3) Va Lerie was not impaired; (4) Investigator Eberle displayed his badge, explained he was a narcotics officer, informed Va Lerie he was not in trouble or under arrest, asked Va Lerie to follow him to the rear baggage terminal, and asked Va Lerie for consent to search his luggage; (5) the search occurred in a room with two open doors in the presence of two to four officers; and (6) no evidence showed Va Lerie was under coercion or duress during his encounter with law enforcement. Based on findings that law enforcement had reasonable articulable suspicion to detain Va Lerie's luggage and Va Lerie voluntarily consented to the search of his luggage, the magistrate judge recommended the district court deny Va Lerie's motion to suppress the evidence obtained as a result of the search of the luggage.

Va Lerie objected to the magistrate judge's recommendations that (1) the seizure of Va Lerie's luggage was reasonable, and (2) Va Lerie consented to the search. The government filed no objections to the magistrate judge's recommendation that Va Lerie's motion to suppress evidence be denied.[2]

Without holding another hearing, the district court considered Va Lerie's objections to the magistrate judge's report and recommendation. Addressing the seizure issue, the district court concluded "the removal of [Va Lerie's checked luggage] and its sequestration in a room of the bus terminal constituted an unconstitutional seizure in violation of [Va Lerie]'s Fourth Amendment rights because they occurred without consent, reasonable suspicion, probable cause, or a warrant."

After concluding law enforcement unconstitutionally seized Va Lerie's checked luggage, the district court then considered "whether [Va Lerie]'s alleged consent to the search of the bag removed the taint of the unlawful seizure." In addressing this issue, the district court asked whether Va Lerie's consent was voluntarily given, and, if so, whether the "consent to the search was an independent act of free will that broke the causal chain between the unconstitutional violation and the consent."

Regarding the voluntariness of Va Lerie's consent to the search of his luggage, the district court noted Va Lerie was a sober adult of normal intelligence; Va Lerie voluntarily responded to Investigator Eberle's page; Va Lerie acquiesced in Investigator Eberle's request to accompany him to a room with two open doors in the rear baggage terminal where at least two other officers were waiting with Va Lerie's

---

[2]Not relevant to this appeal, the government objected to the magistrate judge's recommendation that Va Lerie's suppressed statements could not be used at trial for impeachment purposes. Overruling the government's objections, the district court suppressed Va Lerie's statements. The government has not appealed that decision.

luggage; Investigator Eberle testified Va Lerie consented; Va Lerie's "own testimony indicates that he did not object to the search"; Investigator Eberle was not in uniform and did not display his weapon; and no law enforcement officer directly threatened or coerced Va Lerie. Based on these findings, the district court, however, concluded Va Lerie did not voluntarily consent to the search, because "there is no reason to believe [Va Lerie] or anyone else–even most lawyers–would know that they could refuse the request to search the bag." Furthermore, the district court noted Va Lerie "was alone, in a private room, with at least two armed police officers," and the officers already had Va Lerie's luggage when they asked for consent to search it.

The district court then considered whether Va Lerie's apparent consent purged the unlawful taint of the unconstitutional seizure. In considering this question, the district court noted little time had passed and no significant intervening events had occurred between the unlawful seizure and Va Lerie's apparent consent. The district court concluded the law enforcement officers' purpose in removing the luggage was to obtain incriminating evidence, and their accommodation of Greyhound's request not to bring passengers to the refueling area, a policy of Greyhound for over a year, was irrelevant. Thus, the district court determined Va Lerie's "apparent acquiescence [in the search] did not remove the taint of the illegal seizure." Based upon this reasoning, the court held "the evidence obtained in the search after the illegal seizure is 'fruit from a poisonous tree.'" Sustaining Va Lerie's objections to the magistrate judge's report and recommendation, the district court granted Va Lerie's motion to suppress.

Acting with the approval of the United States Solicitor General, the government timely filed this appeal. The government's main contention is the NSP's removal of Va Lerie's checked luggage from the bus's luggage compartment to the rear baggage terminal to seek permission to search does not constitute a seizure under the Fourth Amendment, "because there was no meaningful interference with [Va Lerie]'s possessory interest in the [luggage] on the part of the investigating

-7-

officers." Depending on this court's resolution of the seizure issue, the government also contends the district court should have adopted the magistrate judge's recommendation that Va Lerie consented to the search of his luggage.

A divided panel of this court affirmed the district court's suppression of the evidence obtained as a result of the search of Va Lerie's luggage. United States v. Va Lerie, 385 F.3d 1141, 1150 (8th Cir. 2004). In reaching this conclusion, the panel majority held Va Lerie's luggage "was seized within the meaning of the Fourth Amendment when [Investigator] Eberle had the bag removed from the bus, taken to a room inside the rear baggage terminal, and detained while the officer endeavored to locate the bag's owner and obtain consent to search the bag." Id. at 1148. Because the government conditioned its consent argument on prevailing with its seizure argument, the panel held the government "waived the argument that [Va Lerie]'s consent purged the taint of the illegal seizure if an illegal seizure occurred." Id. at 1148-49. Thus, the panel never considered "whether the district court clearly erred in its findings concerning the voluntariness of defendant's alleged consent." Id. at 1150. Two panel members urged the *en banc* court to "re-visit the issue of what constitutes a seizure in the context of a temporary removal and inspection of packages and luggage that have been sent or checked with common carriers." Id. at 1151 (Melloy, J., concurring); id. (Riley, J., dissenting). The *en banc* court vacated the panel's opinion and granted rehearing *en banc*.

## II.   DISCUSSION

### A.   Standard of Review

In considering the district court's suppression of evidence, we review the district court's conclusions of law de novo and its factual findings for clear error. United States v. Barry, 394 F.3d 1070, 1074 (8th Cir. 2005). We will affirm the district court's order granting Va Lerie's "motion to suppress 'unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that

a mistake has been made.'" Id. (quoting United States v. Welerford, 356 F.3d 932, 935 (8th Cir. 2004) (citation omitted)). Because a seizure decision involves a pure question of law, we review de novo the district court's holding that the removal of Va Lerie's luggage from the bus constituted a seizure in violation of the Fourth Amendment. See United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001). We review for clear error the district court's factual finding that Va Lerie did not voluntarily consent to the search. Welerford, 356 F.3d at 935.

## B.    Seizure

Our federal Constitution mandates "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; see United States v. Ameling, 328 F.3d 443, 447 (8th Cir. 2003) (Fourth Amendment applies to states through the Fourteenth Amendment). It can be argued our court has not spoken with a consistent voice when considering what constitutes a seizure in cases involving law enforcement's interference with luggage or mailed packages.[3] No matter the merits

---

[3]Compare United States v. Gomez, 312 F.3d 920, 923-24 (8th Cir. 2002) (finding "minimal interference with Gomez's possessory interest" and holding no seizure occurred when a drug interdiction officer at a U.S. Postal Service facility moved a package to a command center twenty yards from a conveyor belt in a sorting area), United States v. Vasquez, 213 F.3d 425, 426 (8th Cir. 2000) (holding no seizure occurred when drug interdiction officers at a Federal Express facility examined the outside of a package and subjected the package to a drug-sniffing dog), United States v. Harvey, 961 F.2d 1361, 1363-64 (8th Cir. 1992) (holding no seizure occurred when police removed luggage from a bus's overhead luggage compartment to the aisle below to subject the luggage to a drug-sniffing dog), and United States v. Riley, 927 F.2d 1045, 1048 n.4 (8th Cir. 1991) (implying no seizure occurred when police subjected an airline passenger's checked luggage to a drug-sniffing dog), with United States v. Morones, 355 F.3d 1108, 1111 (8th Cir. 2004) (holding seizure occurred when a law enforcement officer at a Federal Express facility removed a package from a conveyor belt to subject the package to a drug-sniffing dog), and United States v. Demoss, 279 F.3d 632, 636 (8th Cir. 2002) (same). To the extent

of that argument, we recognize a principled interpretation, and consistent application, of the Seizure Clause of the Fourth Amendment, as explained by the Supreme Court of the United States, is vital to the protection of civil liberties and also to law enforcement's ability to conduct itself in a constitutional manner in the modern era where law enforcement's duties safeguarding commercial transportation, whether by air, land or sea, have never been more solemn. To that end, we strive to speak with a clear voice when discussing the scope of the Seizure Clause.

The Fourth Amendment protects against both unreasonable searches and unreasonable seizures. U.S. Const. amend. IV. Not surprisingly, the Supreme Court has recognized the Search Clause is wholly distinct from the Seizure Clause, such that courts applying these clauses must understand they provide different protections against government conduct. See Segura v. United States, 468 U.S. 796, 806 (1984) ("Different interests are implicated by a seizure than by a search."). According to the Supreme Court, a Fourth Amendment *search* "occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113 (1984). On the other hand, a Fourth Amendment *seizure* of property "occurs when there is some meaningful interference with an individual's possessory interests in that property."[4] Jacobsen, 466 U.S. at 113. While the Search Clause protects an individual's expectation of privacy, the Supreme Court has

_____

these decisions are inconsistent with this opinion, they are no longer controlling precedent in this circuit.

[4]We are not dealing with a search issue; we are confronted with a seizure issue. We also underscore this is not a seizure case involving luggage physically possessed by a commercial bus passenger. See United States v. Place, 462 U.S. 696, 708 (1983) (recognizing detention of luggage within passenger's immediate possession intrudes on passenger's freedom of movement, such that the passenger's travel plans may be disrupted); cf. Hale v. Henkel, 201 U.S. 43, 76 (1906) (noting "a seizure contemplates a forcible dispossession of the owner"). Instead, Va Lerie's seizure case involves checked luggage not in the passenger's immediate possession.

indicated the Seizure Clause relates, in part, to freedom of movement: "While the concept of a 'seizure' of property is not much discussed in our cases, this definition follows from our oft-repeated definition of the 'seizure' of a person within the meaning of the Fourth Amendment–meaningful interference, however brief, with an individual's freedom of movement." Id. at 113 n.5; see also Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 616 (1989) ("The initial detention necessary to procure [] evidence may be a seizure of the person if the detention amounts to a meaningful interference with his freedom of movement. Obtaining and examining the evidence may also be a search if doing so infringes an expectation of privacy that society is prepared to recognize as reasonable.") (citations omitted). The Court also has stated "not every governmental interference with an individual's freedom of movement raises such constitutional concerns that there is a seizure of the person." Skinner, 489 U.S. at 618. It necessarily follows that not every governmental interference with a person's property constitutes a seizure of that property under the Constitution.

After announcing a seizure of property "occurs when there is some meaningful interference with an individual's possessory interests in that property," the Court concluded in Jacobsen that law enforcement's exertion of dominion and control over private property for its own purposes constituted a seizure in that case. Thus, the facts of Jacobsen shed some light on how to apply the Supreme Court's seizure standard. In Jacobsen, Federal Express employees noticed a white powdery substance inside a damaged package, which prompted the employees to contact the Drug Enforcement Administration (DEA). When a DEA agent arrived and was told about the white powdery substance, he opened the damaged package, removed four plastic bags from a tube inside the package, removed traces of the white substance from the plastic bags, and field tested the white substance. The field tests revealed the white substance was cocaine. Other DEA agents also field tested the white substance. When determining whether the agents unlawfully seized and searched the package, the Court concluded the DEA "agents' assertion of dominion and control over the

-11-

package and its contents did constitute a 'seizure.'" Id. at 120. After recognizing "the Magistrate and the District Court found that the agents took custody of the package from Federal Express after they arrived" even though the package's owners "had entrusted possession of the items to Federal Express," the Court held "the decision by governmental authorities to exert dominion and control over the package for their own purposes clearly constituted a 'seizure.'" Id. n.18. Notwithstanding the Court's seizure decision, the Court concluded the seizure was not unreasonable because the agents had probable cause to believe the package contained contraband. Id. at 121-22.

We do not believe the Court meant to express two different standards–i.e., meaningful interference with a person's possessory interests and dominion and control–when instructing courts how to apply Fourth Amendment seizure principles. Instead, we believe the Court referenced dominion and control when applying the seizure standard. That is, we believe the Court concluded law enforcement's exertion of dominion and control over the package for its own purposes–and in contravention to Federal Express's custody of the package–constituted a seizure under the Fourth Amendment because it constituted some meaningful interference with a person's possessory interests. Thus, the seizure standard prohibits the government's conversion of an individual's private property, as opposed to the mere technical trespass to an individual's private property. See, e.g., United States v. Karo, 468 U.S. 705, 712-13 (1984) (explaining the existence of a mere technical physical trespass to an individual's property "is only marginally relevant to the question of whether the Fourth Amendment has been violated," as "[a] 'seizure' of property occurs when 'there is some meaningful interference with an individual's possessory interests in that property'") (quoting Jacobsen, 466 U.S. at 113); Jacobsen, 466 U.S. at 124-25 (stating "the field test [of the white substance] did affect respondents' possessory interests protected by the [Fourth] Amendment, since by destroying a quantity of the powder it converted what had been only a temporary deprivation of possessory interests into a permanent one"); W. Page Keeton, et al., Prosser and Keeton on The

-12-

Law of Torts § 15 at 92, 102 (5th ed. 1984) (recognizing the tort of conversion differs from the tort of trespass in that conversion requires "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the [owner]'s rights," and noting "[t]he gist of conversion is the interference with control of the [owner's] property"). Because we do not believe Jacobsen enunciated separate standards for seizure cases, we will not concern ourselves with trying to apply "both" standards. Instead, we will focus on whether the NSP's conduct constituted some meaningful interference with Va Lerie's possessory interests in his checked luggage.

Armed with the Supreme Court's enunciation of Fourth Amendment seizure principles, we ask whether law enforcement's removal of a commercial bus passenger's checked luggage from the bus's lower luggage compartment to a room inside the bus terminal to seek the passenger's consent to search the luggage constitutes some meaningful interference with the passenger's possessory interests in his luggage.

Seizure issues involving checked luggage are hardly new for circuit courts. A number of circuit court decisions addressing seizure issues similar to this case support our holding the NSP did not seize Va Lerie's checked luggage, because the removal of the luggage did not delay his travel or significantly impact his freedom of movement, affect the timely delivery of the checked luggage, or deprive Greyhound of its custody of the checked luggage. Nearly two decades ago, the Fifth Circuit confronted a similar case. In United States v. Lovell, 849 F.2d 910 (5th Cir. 1988), border patrol agents saw a nervous airline passenger check his luggage. The agents then went to the airline baggage area, removed the passenger's checked luggage from the baggage conveyor belt, and compressed the sides of the luggage several times. When compressing the sides of the luggage, the agents smelled marijuana. The agents then subjected the detained luggage to a drug-sniffing dog, which alerted to the luggage. Based on this information, the agents obtained a search warrant, searched the luggage, and discovered sixty-eight pounds of marijuana. Id. at 911.

After being charged with possession with intent to distribute, the defendant moved to suppress the marijuana, claiming "the agents' removal of his luggage from the conveyor belt and their manipulation and sniff of that luggage constituted a seizure and search within the meaning of the fourth amendment." Id. at 912. The district court denied the motion to suppress, and the Fifth Circuit affirmed, holding the agents did not seize the defendant's luggage. Id. at 916.

In considering whether the agents' conduct constituted some meaningful interference with the defendant's possessory interests in his checked luggage, i.e., whether a seizure had occurred, the Fifth Circuit focused on the defendant's freedom of movement and his expectation of timely delivery of his checked luggage. See id. The court quoted Jacobsen and distinguished Place, noting the defendant "had surrendered his bags to a third-party common carrier with the expectation that the carrier would transport the bags to [the defendant]'s destination for him to reclaim when he arrived" and the defendant's travel would not "have been interfered with or his expectations with respect to his luggage frustrated" had the agents not smelled marijuana. Id. Thus, the court held "[t]he momentary delay occasioned by the bags' removal from the conveyor belt was insufficient to constitute a meaningful interference with [the defendant]'s possessory interest in his bags." Id.

The Ninth Circuit later adopted the Fifth Circuit's approach in Lovell in a case similar to the one we confront today. In United States v. Brown, 884 F.2d 1309 (9th Cir. 1989), the defendant, who appeared to be nervous, checked his new luggage after paying cash for a one-way airline ticket. Based on this information, law enforcement agents had the defendant's checked luggage "held." Id. at 1310. The agents then asked the defendant if they could speak with him, informed him he was not under arrest and that he was free to leave, and asked if they could search his carry-on luggage as well as his checked luggage. The defendant consented to a search of both his carry-on and checked luggage. Because the checked luggage was locked, the agents asked the defendant for the keys to the luggage. Even though the defendant

-14-

claimed he did not have the keys to the luggage, he produced a set of luggage keys. When the defendant refused to accompany the agents when they took the keys to try them on the checked luggage, the agents handcuffed the defendant pending the search. The search of the checked luggage produced two kilograms of cocaine. Id. at 1310-11. The defendant moved to suppress the cocaine, contending the detectives violated the Fourth Amendment by stopping him and holding his checked luggage.

After holding the agents' initial contact with the defendant did not constitute a seizure, the court addressed an issue of first impression for that circuit: "whether the brief diversion of [the defendant]'s suitcases from their journey to the cargo hold was a seizure," i.e., whether the detention of the defendant's checked luggage was a meaningful interference with the defendant's possessory interest in his luggage. Id. at 1311. The court first acknowledged the Place distinction the Fifth Circuit drew in Lovell "between taking property from a traveler's custody and merely detaining bags which the traveler has already relinquished to a third-party common carrier." Id. The court then noted that, had the defendant not consented to a search of his luggage, "the brief detention of [the defendant]'s bags would have in no way interfered with his travel or frustrated his expectations with respect to his luggage." Id. Thus, the court held the agents' detention of the defendant's luggage in the cargo hold area of the terminal did not constitute a Fourth Amendment seizure.[5] Id.

A few years after Brown, the Ninth Circuit again addressed a seizure case in the context of checked luggage. In United States v. Johnson, 990 F.2d 1129 (9th Cir. 1993), an airline passenger, who purchased a one-way ticket with cash, checked in late such that his checked luggage could not be placed on the same flight, but was scheduled to be placed on the next flight leaving two hours after the passenger's flight. Without interfering with the passenger in any way, law enforcement officers

---

[5]We note the court also held "[t]he district court properly found [the defendant] consented to the search" of his luggage. Id. at 1311-12.

-15-

received permission from the airline to go onto the tarmac to investigate the checked luggage. When the officers asked an airline representative if they could take the luggage inside the terminal, the airline representative allowed the officers to take the luggage to an airline office inside the terminal, "but refused to relinquish custody of the luggage to the Drug Enforcement Agency (DEA) office at the airport." Id. at 1130. The airline representative later "allowed the officers, with the airline representative present, to take the luggage to the DEA office" inside the airport. Id. at 1130-31. However, "[t]he airline maintained custody of the luggage at all times." Id. at 1131. After the luggage was taken to the DEA office, a drug-sniffing dog was called to the scene, at which time the luggage was taken into a hallway for the dog-sniff. When the dog alerted to the luggage, the officers seized the bags, obtained a search warrant, searched the luggage, and discovered 2.9 kilograms of cocaine base. Applying Brown, the Ninth Circuit held no Fourth Amendment seizure occurred before the dog sniff. Id. at 1132-33. The court explained its rationale for determining no seizure occurred:

> Here [the passenger]'s only interest was that the airline, as his bailee, would place his luggage on the next plane, which was to leave about two hours after his plane. The entire process of removing the luggage from the cart, taking it from one office to the other, and having the dog sniff it, was completed prior to the time the luggage would have been placed on the airplane. The airline did not give up custody of the luggage to the narcotics officers until after the dog had indicated the presence of narcotics. . . . Because nothing that the officers did interfered with the [passenger]'s possessory interests in his luggage prior to the dog sniffing, there was no seizure of the luggage.

Id. at 1132.

The Seventh Circuit specifically has considered the consequences of police interference with luggage checked with Greyhound. In United States v. Ward, 144 F.3d 1024 (7th Cir. 1998), the defendant in Los Angeles checked his luggage with

Greyhound, which placed the luggage in the bus's luggage compartment accessible only from the outside. The defendant did not board the bus, but instead flew to the bus's destination in Indianapolis to await the bus and claim his luggage. When the bus stopped for a passenger meal break in Springfield, Missouri, drug enforcement officers looked inside the luggage compartment and noticed a suspicious piece of luggage. When no passenger claimed ownership of the suspicious piece of luggage, an officer removed the luggage to subject it to a dog-sniff. After the bus left the station, the officers subjected the detained luggage to the dog-sniff, and the dog alerted to the luggage. Once a search warrant was obtained, an officer searched the luggage and discovered a kilogram of cocaine and a semi-automatic handgun loaded with hollow-point bullets. Officers later apprehended the defendant as he attempted to claim his luggage in Indianapolis. Id. at 1028.

Confronted with the question of whether the drug enforcement officers violated the Fourth Amendment by removing the checked luggage from the bus's luggage compartment, the Seventh Circuit focused on the defendant's possessory interests in his luggage. Id. at 1030-34. Initially, the court noted the defendant "had no cognizable interest in repossessing his bag until the bus arrived" at its destination. Id. at 1031. The court explained that the defendant, by "surrender[ing] custody of the bag to Greyhound . . . could reasonably have foreseen that the bag would be handled, moved around, and even taken off the bus, whether at intermediate stops when the driver might need to remove the bag to sort and/or gain access to other luggage, or at a hub like St. Louis where the bag would have been transferred to another bus." Id. at 1032. The court concluded the defendant "could have no reasonable expectation, in other words, that the bag would not be touched, handled, or even removed from the bus prior to the bag's arrival" at its destination. Id. Because the defendant had few possessory interests in his checked luggage, and because he should have expected his luggage would have been handled by strangers, the court held the officers "did not 'seize' [the defendant]'s bag merely by touching and then removing it from the luggage compartment. Handling the bag to that limited extent did not

-17-

impinge on any of the rights that the Fourth Amendment protects." Id. at 1033. Focusing on the defendant's expectations of timely regaining possession of his luggage from Greyhound, the court noted the officers' interference with the luggage would have constituted a seizure only when it "interrupted the bag's transport" and "interfer[ed] with [the defendant]'s contractually-based expectation that he would regain possession of the bag at a particular time."[6] Id.

In reviewing the Supreme Court's enunciation of Fourth Amendment seizure principles, as well as the approaches taken by the Fifth, Seventh and Ninth Circuits in applying Fourth Amendment seizure principles to checked luggage cases, we make a few observations of our own. Because seizure is defined as some meaningful interference with an individual's possessory interests in his property, not all police interference with an individual's property constitutes a Fourth Amendment seizure, i.e., the police do not seize property every time they handle private property. By requiring some *meaningful interference* with an individual's possessory interests in property, the Supreme Court inevitably contemplated excluding *inconsequential interference* with an individual's possessory interests. We also readily recognize the Supreme Court instructed courts to consider an individual's possessory interests in his property in determining whether a seizure has occurred.

Applying the Supreme Court's definition of seizure with an eye toward the applications provided by the Fifth, Seventh and Ninth Circuits over the past seventeen years, we glean a number of principles that relate to checked luggage cases. First, the Fourth Amendment's Seizure Clause prohibits the government from restraining an individual's freedom of movement. Thus, if law enforcement's detention of checked luggage delays a passenger's travel or significantly impacts the passenger's freedom

---

[6]The Seventh Circuit also recognized the critical difference between removing luggage from a passenger's immediate possession and removing luggage checked with Greyhound and placed in a luggage compartment with other luggage. See id. at 1032 (citing and distinguishing Place, 462 U.S. at 708-09).

of movement, the Seizure Clause is implicated. Second, a commercial bus passenger has less possessory interest in checked luggage than he has in carry-on luggage in his immediate possession. To be certain, a passenger gives up his immediate possessory interest when he checks his luggage with the commercial carrier as bailee. At a minimum, the passenger's possessory interests in his checked luggage entail the right (or at least the expectation) to regain custody, i.e., reclaim immediate possession of the checked luggage at the passenger's or the luggage's destination. Finally, a commercial bus passenger who checks his luggage should reasonably expect his luggage to endure a fair amount of handling–if his luggage were not handled, it would not reach its destination. For instance, a commercial bus passenger's checked luggage must be sorted, loaded, rearranged, possibly transferred to another bus, and unloaded. The luggage may be damaged and require removal from the luggage compartment. If a bus breaks down, a passenger should expect his luggage to be removed from the luggage compartment and either transferred to another bus or taken inside the bus terminal. As long as law enforcement officers do not deprive the commercial carrier of its custody of the checked luggage, no meaningful interference with the passenger's checked luggage occurs.

Boiling these principles down, we believe courts must focus on three factors when considering whether law enforcement's interference with checked luggage constitutes a seizure. First, did law enforcement's detention of the checked luggage delay a passenger's travel or significantly impact the passenger's freedom of movement? Second, did law enforcement's detention of the checked luggage delay its timely delivery? Third, did law enforcement's detention of the checked luggage deprive the carrier of its custody of the checked luggage?[7] If none of these factors is

---

[7]To test the breadth of the carrier's custodial rights, we ask whether the government's actions go beyond the scope of the passenger's reasonable expectations for how the passenger's luggage might be handled when in the carrier's custody. See, e.g., Ward, 144 F.3d at 1032.

satisfied, then no Fourth Amendment seizure has occurred. Conversely, if even a single factor is satisfied, then a Fourth Amendment seizure has occurred.

Our holding is consistent with the holdings of other courts that have confronted seizure issues involving checked luggage. See, e.g., State v. Peters, 941 P.2d 228, 232 (Ariz. 1997) (en banc) (holding the "warrantless detention [of checked luggage at an airport] for examination without reasonable suspicion is not a seizure and is permissible if made in such a manner that neither the traveler nor his luggage is unreasonably delayed")[8]; State v. Goodley, 381 So. 2d 1180, 1182 (Fla. Dist. Ct. App. 1980) ("It is obvious that [an airline] traveler who checks his luggage has no knowledge and, in fact, no real concern as to precisely where his bag may be located within the airline's custody at any given time. It follows that the slight movement [by law enforcement] of [the defendant]'s unopened bag from the [baggage] cart to the floor [about a foot away so a drug dog could conduct a sniff search] . . . did not, even remotely, amount to a fourth amendment seizure . . . ."); cf. United States v. Gant, 112 F.3d 239, 240, 242 (6th Cir. 1997) (holding police officers' removal of luggage from an overhead compartment of a Greyhound bus to subject the luggage to a drug-sniffing dog did not constitute a seizure under the Fourth Amendment).

---

[8]Citing "modern conditions," the Arizona Supreme Court stated, "Today police, airport security personnel, and travelers must all be concerned not only that drugs may be transported but that explosives, incendiary devices, and other items that threaten the safety of those on the airplane may be stored in luggage in the airplane's baggage compartment. Travelers today expect and want luggage X-rayed, sniffed, felt, and handled in a manner that is as non-intrusive as possible but consistent with ensuring that the checked luggage does not contain items that threaten their safety. Brief, non-intrusive detention of checked luggage for such examination no longer invades the traveler's reasonable expectation of privacy, does not unduly interfere with possessory rights, and is not a seizure under the Fourth Amendment." Id. at 231.

Our holding also comports with the views expressed by many judges in this circuit. See, e.g., Va Lerie, 385 F.3d at 1150 (Melloy, J., concurring) (opining "that a brief detention of a piece of luggage that does not result in the delay of either the passenger, or ultimate delivery of the luggage, is not a seizure"); Gomez, 312 F.3d at 923-24 (Bowman, J., with Hansen and Bye, JJ.) (holding no seizure occurred when a drug interdiction officer at a post office moved a package to a command center twenty yards from a conveyor belt in a sorting area); Demoss, 279 F.3d at 640 (Hansen, J., concurring) (choosing "to cast my lot with those cases both from this and other circuits indicating that a piece of luggage . . . delivered to a common carrier is not 'seized' within the meaning of the Fourth Amendment until the authorities have interfered with a possessory interest in the luggage . . . such that the expectation of timely delivery of the . . . luggage has been frustrated"); Vasquez, 213 F.3d at 426 (Fagg, J., with Wollman and Murphy, JJ.) (holding no seizure occurred when drug interdiction officers at a Federal Express facility subjected a package to a drug-sniffing dog); Riley, 927 F.2d at 1048 n.4 (Gibson, John R., J., with Magill and Beam, JJ.) (implying no seizure occurred when police subjected an airline passenger's checked luggage to a drug-sniffing dog); cf. Harvey, 961 F.2d at 1363-64 (per curiam with Wollman and Hansen, JJ., and Lay, J., dissenting) (holding police officers' removal of luggage from a bus's overhead luggage compartment to subject the luggage to a drug-sniffing dog during a refueling stop did not constitute a Fourth Amendment seizure).

Having announced what we hope are manageable factors to consider when confronted with seizure cases involving checked luggage, we now apply those factors to this case. First, the NSP's brief and temporary removal of Va Lerie's checked luggage from the luggage compartment to ask Va Lerie to consent to a search did not delay Va Lerie's travel or impact his freedom of movement. Va Lerie's travel was delayed, and his freedom of movement impacted, only after the NSP searched the luggage and discovered a large amount of illegal drugs. Second, the NSP's removal of Va Lerie's checked luggage from the bus did not affect the timely delivery of the

luggage. No evidence suggests the luggage would not have been placed back on the bus for transport to its destination had it not been for the discovery of illegal drugs. Finally, Va Lerie's possessory interests in his checked luggage certainly included an expectation that Greyhound–or others at Greyhound's request–would remove the luggage from the lower luggage compartment. The NSP would have preferred to bring Va Lerie to the bus in the refueling area to seek permission to search, but Greyhound asked the NSP not to bring passengers to that area. Thus, the NSP removed Va Lerie's checked luggage from the lower luggage compartment to a room inside the terminal at Greyhound's request. In doing so, the NSP never deprived Greyhound of its custody of Va Lerie's checked luggage.[9] We conclude the NSP's removal of Va Lerie's checked luggage from the bus to a room inside the terminal to seek consent to search did not constitute a meaningful interference with Va Lerie's possessory interests in his luggage. Therefore, no Fourth Amendment seizure occurred.[10]

_____

[9]Had the NSP exerted dominion and control over Va Lerie's luggage such that it deprived Greyhound of its custody of the luggage, then a seizure would have occurred. That is what happened in Jacobsen. Federal Express employees notified the DEA that a damaged package contained a white powdery substance. When the DEA agents arrived to search the package and test the white powdery substance, they took custody of the package by exerting dominion and control over it for their own purposes, i.e., they converted the package. The DEA agents were not going to return the package to Federal Express until after the agents searched the package and tested the white powdery substance. Here, the NSP never deprived Greyhound of custody of the checked luggage, at least not until Va Lerie consented to a search that unveiled cocaine. Indeed, the NSP adopted the policy of removing the luggage from the bus to present to the owner to seek consent to search at Greyhound's prompting. We see little, if any, distinction between the NSP's removal of the luggage to present it to Va Lerie to seek consent to search and the NSP simply asking Va Lerie to consent to a search.

[10]The Fourth Amendment prohibits unreasonable seizures. Because the government does not argue the NSP's conduct was reasonable and because we hold the removal of the luggage from the bus to seek Va Lerie's consent to search did not

## C.    Consent to Search

Contingent upon our reversal of the district court's seizure decision, the government asks us to reverse the district court's finding Va Lerie did not voluntarily consent to the search of his luggage.  Because we reverse the district court on the seizure issue, we must examine the district court's consent decision.  If Va Lerie voluntarily consented to the search of his luggage, then no Fourth Amendment violation occurred in this case.  See Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); United States v. Brown, 345 F.3d 574, 579 (8th Cir. 2003).

In determining whether Va Lerie voluntarily consented to a search of his luggage, we must consider the totality of the circumstances surrounding the alleged consent, paying particular attention to the following factors:

> personal characteristics of the defendant, such as age, education, intelligence, sobriety, and experience with the law; and features of the context in which the consent was given, such as the length of detention or questioning, the substance of any discussion between the defendant and police preceding the consent, whether the defendant was free to leave or was subject to restraint, and whether the defendant's contemporaneous reaction to the search was consistent with consent.

United States v. Jones, 254 F.3d 692, 696 (8th Cir. 2001).  After listening to the testimony of Investigator Eberle and Va Lerie, as well as viewing their actual testimony to make credibility determinations, the magistrate judge found Va Lerie voluntarily consented to the search of his luggage.  Without the benefit of viewing Investigator Eberle and Va Lerie as they testified, the district court conducted a de novo review of the record.  After reviewing the record, the district court rejected the magistrate judge's recommended finding that Va Lerie voluntarily consented to the search of his luggage.

---

constitute a seizure, we do not address the reasonableness of the NSP's conduct.

Based on our review of the record and the district court's findings, we conclude the district court erred in rejecting the magistrate judge's recommended finding that Va Lerie voluntarily consented to the search of his luggage. The following factual findings strongly support a finding Va Lerie voluntarily consented to the search: (1) Va Lerie is 37 years old, has three years of college education, and enjoys normal intelligence; (2) Va Lerie voluntarily responded to Investigator Eberle's page; (3) Investigator Eberle displayed his badge, explained he was a narcotics officer, informed Va Lerie he was not in trouble or under arrest, and asked Va Lerie to follow him to the rear baggage terminal; (4) Va Lerie acquiesced in Investigator Eberle's request to accompany him to a room with two open doors in the rear baggage terminal where one or two other officers were waiting with Va Lerie's luggage; (5) Investigator Eberle asked Va Lerie for consent to search his luggage; (6) Va Lerie verbally consented to the search, according to Investigator Eberle; (7) Va Lerie understood Investigator Eberle's questions; (8) Va Lerie was sober and not impaired; (9) Va Lerie's "own testimony indicates that he did not object to the search"; (10) Investigator Eberle was not in uniform and did not display his weapon; and (11) no law enforcement officer threatened or coerced Va Lerie.

The only findings the district court mentioned to support its no-consent decision were (1) the district court's statement "there is no reason to believe [Va Lerie] or anyone else–even most lawyers–would know that they could refuse the request to search the bag"; (2) the officers did not give Va Lerie any Miranda warnings; (3) Va Lerie "was alone, in a private room, with at least two armed police officers"; and (4) the officers already had Va Lerie's luggage when they asked for consent to search it.

Given the numerous facts supporting a finding of voluntary consent, we reject the district court's finding that Va Lerie did not voluntarily consent to the search of his luggage. First, the district court surmised anyone, including attorneys, would not have known they had the right to refuse to consent to the search of the luggage, and

-24-

noted the officers failed to give Va Lerie any <u>Miranda</u> warnings. The Supreme "Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search." <u>United States v. Drayton</u>, 536 U.S. 194, 206 (2002). Although Investigator Eberle did not specifically warn Va Lerie of the pitfalls of consenting to a search of his luggage containing five vacuum-sealed packages of cocaine, Investigator Eberle did seek permission to search the luggage, which implied Va Lerie could refuse permission and, therefore, supports a finding of voluntary consent. <u>See</u> <u>id.</u> at 207. We also recognize the record does not suggest Va Lerie did not know he had the right to refuse to search; instead, the record reflects Va Lerie expressly consented to the search and never objected to the search.[11]

Second, we are not persuaded that two or three officers being armed with holstered firearms in a private room inside a bus terminal negates Va Lerie's consent. <u>Id.</u> at 205 ("That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."). Taken in context with the totality of the circumstances, these findings do not overcome the district court's other findings, both explicit and implicit, that "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." <u>Id.</u> at 204.

---

[11]If the district court's unsubstantiated observation that most lawyers do not know the police have no right to search luggage without probable cause or consent is correct, we would be sadly disappointed. The Supreme Court teaches, "In a society based on law, the concept of agreement and consent should be given a weight and dignity of its own. Police officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes place, it dispels inferences of coercion." <u>Id.</u>

Finally, we give little weight in this case to the officers' presenting Va Lerie's checked luggage to him when requesting permission to search, because this evidence does not transform the consensual encounter between the NSP and a bus passenger into a coercive encounter. Given our holding that the NSP was not constitutionally forbidden to remove the checked luggage from the bus to present the luggage to Va Lerie to seek consent to search, we would be hard-pressed to conclude such a presentation would be any different than simply asking Va Lerie for permission to search his checked luggage. See, e.g., Brown, 884 F.2d at 1311-12 (holding airline passenger voluntarily consented to a search of his checked luggage).

Accordingly, we reverse the district court's erroneous consent determination, because Va Lerie's consent to search his luggage was voluntary.

## III.  CONCLUSION

For the foregoing reasons, we reverse the district court's decision granting Va Lerie's motion to suppress, vacate the court's suppression order, and remand for further proceedings consistent with this opinion.

WOLLMAN, Circuit Judge, concurring.

With the exception of footnotes 8, 9, and 11, which I view as unnecessary to the resolution of the issues before us, I concur in the court's opinion.

COLLOTON, Circuit Judge, with whom McMILLIAN, ARNOLD, BYE and SMITH, Circuit Judges, join, dissenting.

I believe the court's holding conflicts with the Supreme Court's decision in *United States v. Jacobsen*, 466 U.S. 109 (1984). I therefore respectfully dissent.

The question presented in this appeal is whether Nebraska State Police investigators effected a "seizure" of Keith Va Lerie's luggage, within the meaning of the Fourth Amendment, when they took physical possession of his garment bag and carried it from the Greyhound bus on which Va Lerie was traveling to a room in the bus terminal, for the purpose of summoning Va Lerie and seeking his consent to search the bag as part of their investigation of suspected drug trafficking. Although the magistrate judge recommended denying Va Lerie's motion to suppress on the ground that investigators had "reasonable suspicion" to seize the bag, the government has abandoned that argument on appeal, and does not otherwise argue that a seizure of the luggage was "reasonable." *See* Brief of Appellant at 5 ("[T]he United States does not advance the proposition that there was reasonable suspicion to remove the garment bag from the area where the bus was being refueled to the office in the bus terminal itself. Rather, the United States argues that that activity does not constitute a seizure for constitutional purposes.") (emphasis in original); *cf. United States v. Van Leeuwen*, 397 U.S. 249, 252-53 (1970). Nor does the government contend that Va Lerie's alleged consent to search the luggage was an independent act of free will that purged the taint of any unconstitutional seizure. *See United States v. Va Lerie*, 385 F.3d 1141, 1149-50 (8th Cir. 2004); *id.* at 1150 (Melloy, J., concurring) ("The government made the tactical decision to challenge the district court decision solely on the grounds that the district court was wrong in its ruling that a seizure occurred."). The critical question before us, therefore, is whether the luggage was "seized," and *Jacobsen* dictates that the answer is yes.

*Jacobsen* involved a Federal Express package en route to the residence of Bradley and Donna Jacobsen in Apple Valley, Minnesota. *See United States v. Jacobsen*, 683 F.2d 296, 297-98 (8th Cir. 1982). The package was damaged by a forklift at the Minneapolis-St. Paul airport Federal Express office, prompting Federal Express employees to examine the contents. When they discovered a white powder inside the package, Federal Express personnel notified the Drug Enforcement Administration, and agents traveled to the airport to investigate. Federal Express

employees invited an agent to examine the contents of the package, 466 U.S. at 119, 121, and after the box was placed on a desk in the Federal Express office, the agent proceeded to reopen the package and conduct a "field test" on the white powder. *Id.* at 111-12.

In discussing whether the DEA agents made an initial "seizure" of the package before conducting the field test, the Court first made the general statement that "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id.* at 113. In applying that standard to the facts of *Jacobsen*, the Court concluded that "the agents' assertion of dominion and control over the package and its contents did constitute a 'seizure.'" *Id.* at 120. The Court explained that although the Jacobsens "entrusted possession of the items to Federal Express, the decision by governmental authorities to exert dominion and control over the package for their own purposes clearly constituted a 'seizure,' though not necessarily an unreasonable one." *Id.* at 120 n.18. This holding is consistent with the Court's later observation that "[f]rom the time of the founding to the present, the word 'seizure' has meant a 'taking possession,'" and that "[f]or most purposes at common law, the word connoted . . . bringing [an object] within physical control." *California v. Hodari D.*, 499 U.S. 621, 624 (1991) (internal citations omitted).

There is no viable distinction between this case and *Jacobsen* on the question whether governmental authorities effected a seizure. Although Va Lerie entrusted possession of his luggage to Greyhound, NSP investigators exerted dominion and control over the luggage for their own purposes. That is, they identified the luggage for investigation, took physical possession and control of the garment bag at the bus, and moved it to a non-public room in the bus station, where three or four investigators were present. *United States v. Va Lerie*, No. 8:03CR23, 2003 WL 21956437 (D. Neb. Aug. 14, 2003), at *1, 4; *United States v. Valerie*, 2003 WL 21953948 (D. Neb. June 10, 2003), at *1 (report and recommendation). They did so for the purpose of

furthering their law enforcement investigation of potential drug trafficking by summoning Va Lerie and seeking his consent to search the luggage. *Valerie*, 2003 WL 21956437, at *1. According to *Jacobsen*, therefore, this action by the NSP investigators constituted a seizure. 466 U.S. at 120 n.18.

*Jacobsen* cannot be distinguished on the ground that the DEA agents destroyed a quantity of the white powder in the Federal Express package by conducting a field test. *Cf. ante*, at 13 (citing *Jacobsen*, 466 U.S. at 124-25, for the proposition that "the field test did affect respondents' possessory interests"). The Court was clear that an "initial 'seizure'" involving a "temporary deprivation of possessory interests," 466 U.S. at 124-25, took place when agents made "the decision . . . to exert dominion and control over the package for their own purposes," *id*. at 120 n.18, not when an agent destroyed some of the powder. The Court separately analyzed the significance of the field test, concluding that it reasonably "converted what had been only a temporary deprivation of possessory interests into a permanent one." *Id*. at 124-25. Nor did the occurrence of the initial seizure in *Jacobsen* depend on the fact that agents intended "to search the package." *Cf. ante*, at 22 n.9. *Jacobsen* did not involve a Fourth Amendment "search" at all, 466 U.S. at 120, 124, and the Court subsequently relied on *Jacobsen* when it held unanimously that "seizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place." *Soldal v. Cook County*, 506 U.S. 56, 68 (1992).

Under the test applied by the court today, the initial seizure in *Jacobsen* would not be a seizure. First, the initial seizure of the Federal Express package of course did not delay any travel by the Jacobsens or impact their freedom of movement. Second, there is no reason to believe the "temporary deprivation" occasioned by the "decision . . . to exert dominion and control over the package" delayed the delivery of the Jacobsens' package, and the Court in no way relied on potential delay in announcing its conclusion. In fact, after only a "short time" at the Federal Express office (including further investigation beyond the initial seizure), the package was

"rewrapped and Federal Express was directed to deliver the package to the addressee shown on the label." 683 F.2d at 297; *see also* 466 U.S. at 111-12.

And third, if law enforcement's physical possession and control of Va Lerie's luggage – in a room inside the bus terminal without Greyhound personnel present – did not temporarily deprive Greyhound of its custody of the luggage, then neither did the DEA's possession of the Federal Express package in *Jacobsen* deprive the courier of its custody of the package. The majority says the NSP "never deprived Greyhound of its custody" of the garment bag, because "NSP removed Va Lerie's checked luggage from the lower luggage compartment to a room inside the terminal at Greyhound's request." *Ante*, at 22. By that reasoning, Federal Express surely was not "deprived of custody" when the Jacobsens' package was "placed on a desk" in the Federal Express office, 466 U.S. at 111, and examined by a DEA agent, after Federal Express employees "invited the federal agent to their offices for the express purpose of viewing" the contents of the package. *Id*. at 119.[12] And if the NSP did not exceed

_____

[12]The better view, in my judgment, is that the DEA agents in *Jacobsen* and the NSP investigators in this case took "custody" of the package and luggage, respectively, when they took physical possession and control of the containers for the purpose of investigating their contents. *See Black's Law Dictionary* 390 (7th ed. 1999) (defining "custody" as "the care and control of a thing . . . for inspection, preservation, or security"); *ante*, at 19 (equating "custody" with "immediate possession"). The subjective belief or assertion of an NSP investigator that Va Lerie's bag "was not in our custody," *ante*, at 3, certainly is not dispositive, and the district court made no finding that the investigators' physical possession and control of the luggage for investigative purposes did not amount to "custody" of the luggage. Rather, the district court found that the NSP investigators "removed," "detained," "seized," "sequestered," and exerted "thorough 'dominion and control'" over the garment bag. *Va Lerie*, 2003 WL 21956437, at * 2, 4, 8. *Cf. Jacobsen*, 466 U.S. at 120 n.18 (noting district court found that agents "took custody" of package, and holding that exertion of "dominion and control" over package constituted a seizure). In any event, under either approach to the issue of "custody," there is no perceptible distinction between this case and *Jacobsen*.

Va Lerie's "reasonable expectations for how the passenger's luggage might be handled," *ante*, at 20 n.7, (despite no apparent evidence that Greyhound itself typically moved checked luggage from the bus to rooms inside the terminal during intermediate stops), then the DEA agents who effected the "initial seizure" of the Jacobsens' package (prior to the field test) certainly did not exceed reasonable expectations about handling of the package by the private carrier when they merely replicated what Federal Express itself already had done. 466 U.S. at 119-20. Thus, the court's three-factor test, as applied, conflicts with *Jacobsen*.

Although the court asserts that its new test comports with the views of many judges in this circuit, *ante*, at 21-22, none of our prior holdings dictates the conclusion reached today.[13] To be sure, our court has recognized that not *every* interference with a person's property constitutes a "seizure" under the Fourth Amendment, because some interferences are not "meaningful." *E.g.*, *United States v. Gomez*, 312 F.3d at 923. But in arriving at its holding, the court is forced to overrule or distinguish without explanation several decisions – rendered by some of the same judges cited by the majority – recognizing that law enforcement's exercise of dominion and control over an object entrusted to a bailee, for the purpose of conducting investigation beyond an observation of the object's exterior, does constitute a "seizure" under *Jacobsen*. *See ante*, at 9 n.3.

---

[13]The only holdings said to be on point are *United States v. Gomez*, 312 F.3d 920, 923-24 (8th Cir. 2002), and *United States v. Vasquez*, 213 F.3d 425, 426 (8th Cir. 2000). *Gomez* itself, however, stated that a seizure *does* occur when, as here, an officer exerts dominion and control over an object "by deciding to go beyond a superficial inspection of the exterior of the packages and to detain the packages for further inquiry into characteristics that could not be observed by merely holding the package." 312 F.3d at 923 n.2 (citing *Jacobsen*, 466 U.S. at 121 n.18). *Vasquez* is distinguishable, because it held that there was no seizure where officers *did not* take possession of packages at a sorting station, but merely brought a narcotics dog to sniff the packages as a Federal Express driver "continued to load the accumulated parcels unimpeded." 213 F.3d at 426.

Most recently, in *United States v. Morones*, 355 F.3d 1108 (8th Cir. 2004), we held that a deputy's removal of a FedEx package from an outbound conveyor belt for the purpose of subjecting the package to a canine sniff was a "meaningful interference" with "possessory interests" under *Jacobsen*, despite the government's assertion that no evidence showed that the brief detention of the package would have delayed its delivery. *Id.* at 1111. This holding followed ineluctably from *Jacobsen*, which even analogized the field test for which the package was detained to a "sniff test" by a trained narcotics dog. 466 U.S. at 123-24. We previously reached the same conclusion in at least two other cases. *United States v. Walker*, 324 F.3d 1032, 1036 (8th Cir. 2003) ("It is clear under our precedent that when [the agent] moved the package to a separate room for a canine sniff, the package was seized for Fourth Amendment purposes."); *United States v. Demoss*, 279 F.3d 632, 636 (8th Cir. 2002) ("As Meyer moved the package away from the conveyor belt and detained the package for a canine sniff, he 'exert[ed] dominion and control over the package,' that is, the package was seized for Fourth Amendment purposes.") (citing *Jacobsen*, 466 U.S. at 121 n.18); *see also Gomez*, 312 F.3d at 923 n.2; *United States v. Fuller*, 374 F.3d 617, 621 (8th Cir. 2004).

The three-judge panel that first heard this case acknowledged that Va Lerie's case is indistinguishable from *Morones*, *Walker*, and *Demoss*. *Va Lerie*, 385 F.3d at 1147-48; *id.* at 1150 (Melloy, J., concurring); *see also id.* at 1151-52 (Riley, J., dissenting) (declining to follow *Morones*, *Walker*, and *Demoss*). The court today suggests no distinction. These precedents represent a faithful application of *Jacobsen*, and we should follow them here.[14]

_____

[14]The four decisions from other circuits cited by the court do not provide persuasive support for the conclusion that there was no seizure of Va Lerie's luggage under the rule of *Jacobsen*. None of the cited opinions even discussed the Supreme Court's analysis of the initial seizure in *Jacobsen*. In the Ninth Circuit decisions, moreover, the private airlines – unlike Greyhound here – did not give up possession and control of the passenger's property until after a dog had indicated the presence

The Supreme Court did not regard the initial seizure in *Jacobsen* as a close question: The DEA's possession and control of the package "*clearly* constituted a 'seizure.'" 466 U.S. at 120 n.18 (emphasis added). This although the Jacobsens were merely intended recipients who had never actually possessed the package, the initial seizure would have occasioned no delay in delivery, and the package was examined by a government agent at the invitation of Federal Express, in the office of the private carrier, in the same manner that Federal Express previously had examined it. *Jacobsen* must be our guiding light. Absent a revision of doctrine by the Supreme Court, the NSP investigators effected a "seizure" of Va Lerie's bag, and the order of the district court should be affirmed.

_____

of narcotics or the passenger had consented to a search. *United States v. Johnson*, 990 F.2d 1129, 1130-31 (9th Cir. 1993) (explaining that an airline representative was present with officers at all times, and that the airline refused to relinquish custody of luggage to DEA); *United States v. Brown*, 884 F.2d 1309, 1310 (9th Cir. 1989) (explaining that agents "arranged to have Brown's [checked] luggage held" until he granted consent). And the Seventh Circuit in *United States v. Ward*, 144 F.3d 1024 (7th Cir. 1998), held only that an agent did not "seize" a bag "merely by touching it and then removing it from the luggage compartment" of a bus, and that a seizure *did* occur when the agent's decision to hold the bag for canine inspection interrupted the bag's transport. *Id*. at 1033. The court rendered no decision on a situation like Va Lerie's, where agents took possession and control of luggage for the purpose of seeking consent to search, or a case like *Morones*, where agents exerted dominion and control over a package in order to conduct a canine sniff, without delaying the transport of the package.