# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2647

_____

United States of America,　　　　　　　*
　　　　　　　　　　　　　　　　　　　*
　　　　　　　　Appellant,　　　　　　 *
　　　　　　　　　　　　　　　　　　　*　Appeal from the United States
　　　　v.　　　　　　　　　　　　　　*　District Court for the
　　　　　　　　　　　　　　　　　　　*　District of Nebraska
Christian Alvarez-Manzo, also known　 *
as Francisco Perez Alejandro Isaiz,　 *
　　　　　　　　　　　　　　　　　　　*
　　　　　　　　Appellee.　　　　　　　*

_____

Submitted: December 10, 2008
Filed:  July 6, 2009

_____

Before COLLOTON, BRIGHT, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

The United States appeals the order of the district court[1] granting a motion to suppress ten kilograms of cocaine found during the search of Christian Alvarez-Manzo's bag.  This evidence led to Alvarez-Manzo's indictment for possession with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1).  The district court suppressed the evidence, and we affirm its order.

_____

[1]The Honorable Joseph F. Bataillon, Chief Judge, United States District Court for the District of Nebraska.

I.

The Nebraska State Patrol ("NSP") Drug Commercial Interdiction Unit ("CIU") targets hubs of interstate transportation of persons and parcels to detect criminal activity, including the Omaha Greyhound Bus Depot ("Greyhound Bus Depot"). NSP Investigator Eberle ("Investigator Eberle") is assigned to the CIU. On October 31, 2007, Investigator Eberle and other members of the CIU, NSP Investigator Rasgorshek, NSP Investigator Lutter, NSP Investigator Scott, Sergeant Elliott, and Drug Enforcement Administration Special Agent Orduna, were at the Greyhound Bus Depot. A bus arrived at the terminal around 5:30 a.m., and the officers engaged in their usual routine of watching the passengers. Passengers proceeding on to another destination ("through passengers") are required to get off the bus and enter the terminal while the bus is cleaned and refueled. Passengers whose destination is Omaha may carry luggage with them off the bus or obtain luggage from the undercarriage cargo area of the bus. The officers observed luggage in the cargo area which the bus driver had opened to allow passengers and baggage handlers to obtain luggage.

The cargo area was not full. It contained approximately five to seven bags. Investigator Eberle's attention was drawn to a newer black Swiss bag. He used his flashlight to view the bag and its baggage check tag. Investigator Eberle saw that the tag indicated that the bag was coming from St. Louis, Missouri, and was destined for Dayton, Ohio. Investigator Eberle testified that this route caught his attention because it was not consistent with a bag coming to Omaha.[2] Investigator Eberle noted the words "Indianapolis[,] IL" were handwritten on the baggage check tag. He testified that this was the first bag he had seen where the computer-generated tag had a different destination in handwriting. Investigator Eberle also noted that the bag had

_____

[2]Investigator Eberle testified that he had been observing bus traffic and baggage for the past six years.

an aftermarket padlock affixed. At that point, Investigator Eberle took possession of the bag, removing it from the cargo area. Another investigator located another bag of interest unrelated to this case.

After all the through passengers were reloaded by the bus driver, Investigator Eberle asked the bus driver if the officers could board the bus in order to locate the owners of the two bags of interest. The bus driver had not completed his departure routine and told the officers they could make the inquiries. Investigator Eberle stood in the aisle in the front of the bus followed by Investigators Lutter and Scott. Another officer was stationed at the front of the bus, near the driver's seat, in order to stop ingress and egress from the bus and ensure officer safety. The officers were in plain clothes. The bus had a 52-passenger capacity and was approximately half-full. The bus driver was not on the bus.

Investigator Lutter held up the black Swiss bag. Investigator Eberle announced to the passengers that they were law enforcement officers, that there were no problems and no one was under arrest, and that the officers were attempting to find the owner of the bag being held up which was found in the cargo area of the bus. None of the passengers responded. Investigator Eberle then read aloud the city of origin and destination on the baggage claim tag as well as the name printed on it, Francisco Perez. No passenger responded. Investigator Eberle noticed that Alvarez-Manzo paid more attention to the bag than the other passengers. Investigator Eberle then told the passengers that the officers would go to the rear of the bus and ask each passenger, in turn, whether the bag belonged to them and asked the passengers to respond "yes" or "no." Investigator Eberle took the black Swiss bag from Investigator Lutter and walked to the rear of the bus and asked each passenger whether the bag belonged to them. Receiving negative responses, Investigator Eberle worked his way up the aisle until he reached Alvarez-Manzo at the middle portion of the bus.

Investigator Eberle asked Alvarez-Manzo if the bag belonged to him. Alvarez-Manzo stated "sí" followed by "yes." Investigator Eberle asked Alvarez-Manzo, both in English and Spanish,[3] if he was Francisco Perez. Alvarez-Manzo responded "sí" and "yes." Investigator Eberle again asked Alvarez-Manzo if the bag belonged to him, and Alvarez-Manzo said "sí" and "yes." Investigator Eberle asked Alvarez-Manzo if he would could step off the bus so Investigator Eberle could ask some questions about the bag. Alvarez-Manzo stated "sí" and "yes" and stepped in front of Investigator Eberle to walk off the bus. Investigator Eberle, with the bag, followed Alvarez-Manzo off the bus to an unloading area about six feet from the bus door. Investigator Rasgorshek stood nearby. Investigators Lutter and Scott remained on the bus and dealt with the other bag which is unrelated to this case.

After they had exited the bus, Investigator Eberle displayed his credentials to Alvarez-Manzo and explained to him, in English and Spanish, that Investigator Eberle was a police officer, that Alvarez-Manzo was not under arrest or in any kind of trouble, and that Investigator Eberle wanted to ask Alvarez-Manzo some questions about the bag. Alvarez-Manzo stated that he understood and appeared to have no difficulty understanding Investigator Eberle. Alvarez-Manzo began breathing heavily, and he started shaking after Investigator Eberle displayed his credentials. Alvarez-Manzo's nervousness appeared to increase as his conversation with Investigator Eberle proceeded. When Investigator Eberle again asked Alvarez-Manzo if the bag was his and Alvarez-Manzo did not respond, Investigator Eberle asked Alvarez-Manzo for a bus ticket. In English, Alvarez-Manzo stated the ticket was on the bus. Investigator Eberle asked Alvarez-Manzo if he had any identification on him. Without verbally responding, Alvarez-Manzo reached into his right front pocket and began removing a blue envelope in which Greyhound bus tickets are normally

---

[3]Investigator Eberle's Spanish is limited to the Spanish he learned while on the job.

-4-

enclosed. After partially removing the envelope from his pocket, Alvarez-Manzo pushed the envelope back into his pocket and said "no, I don't have any ID with me."

Alvarez-Manzo then turned to reenter the bus. As he did so, Investigator Eberle noticed a bulging wallet in Alvarez-Manzo's rear pocket. Investigator Eberle asked Alvarez-Manzo if his identification was in the wallet. Alvarez-Manzo did not respond verbally. After Investigator Eberle repeated the inquiry, Alvarez-Manzo turned around, walked towards Investigator Eberle, reached into his own back pocket, retrieved the wallet, and handed the wallet to Investigator Eberle. As Alvarez-Manzo handed the wallet to Investigator Eberle, Alvarez-Manzo's hand was shaking so much that he almost dropped the wallet. Investigator Eberle took the wallet, handed it back to Alvarez-Manzo, and asked for consent to search the wallet. Alvarez-Manzo replied "sí" and "yes." Investigator Eberle opened the wallet and saw a baggage tag claim ticket in the name of Francisco Perez. Investigator Eberle put the wallet in his coat pocket and placed Alvarez-Manzo in handcuffs. Investigator Eberle testified that he handcuffed Alvarez-Manzo to prevent Alvarez-Manzo from fleeing and for officer safety. Investigator Eberle asked Investigator Rasgorshek to take Alvarez-Manzo and his bag into the baggage room of the bus terminal. The scheduled departure of the bus was not delayed by the officers' actions.

Investigator Eberle then retrieved his drug detection canine, Rocky, from his vehicle and took the canine to the baggage room of the bus terminal where Rocky performed a sniff of the black bag. Rocky gave a positive indication for the presence of narcotics. Following Rocky's alert, the bag and Alvarez-Manzo were transported to the NSP traffic office in Omaha. At the NSP traffic office, an officer, who was fluent in Spanish, was called in to interview Alvarez-Manzo, but Alvarez-Manzo declined to make a statement. The bag was transported to the Douglas County Sheriff's Office and subjected to a scan from a GE Vapor Traser II, an ion scanner, which indicated the presence of heroin on the exterior of the bag. Investigator Eberle applied for a search warrant from a Douglas County judge. The search warrant

application detailed the events which had transpired at the Greyhound Bus Depot, the canine sniff, and the ion scan. A search warrant was issued for the bag and Alvarez-Manzo's person. The search warrant was executed, and various items were seized, including ten kilograms of cocaine.

On December 11, 2007, a federal grand jury returned a one-count indictment, charging Alvarez-Manzo with distribution and possession with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1). Alvarez-Manzo pled not guilty at his arraignment. On January 17, 2008, Alvarez-Manzo filed a motion to suppress. On February 15, 2008, the magistrate judge held a hearing on the motion to suppress. On April 11, 2008, the magistrate judge issued a Report and Recommendation ("R & R"), recommending that the motion to suppress be denied. Specifically, the magistrate judge concluded that: (1) Alvarez-Manzo's encounter with the officers remained a consensual encounter until he was placed in handcuffs, (2) the officers were justified in the subsequent temporary investigatory detention of Alvarez-Manzo based on his unusual conduct, (3) the duration of the detention was not unreasonably long before Investigator Eberle retrieved Rocky, who was nearby, to conduct a sniff of the luggage, (4) based upon Rocky's indication, the officers had probable cause to further detain the bag and seek a search warrant, and (5) because Alvarez-Manzo admitted ownership of the bag and had a baggage claim stub matching the bag's check tag, the officers had probable cause to detain Alvarez-Manzo. Alvarez-Manzo filed timely objections to the R & R.

The district court declined to follow the magistrate judge's recommendation and granted the motion to suppress. First, the district court concluded that Investigator Eberle's removal and possession of Alvarez-Manzo's bag was a seizure within the meaning of the Fourth Amendment, and the seizure violated Alvarez-Manzo's Fourth Amendment rights because Investigator Eberle lacked reasonable suspicion to justify the seizure of the bag. Second, the court determined that Alvarez-Manzo's person was seized on the bus in violation of the Fourth Amendment because Investigator Eberle

lacked reasonable suspicion. Third, the court concluded that the removal of Alvarez-Manzo from the bus and his questioning constituted custodial interrogation such that all of his statements were inadmissible because a Miranda[4] warning did not precede the questioning. Fourth, the court determined that Alvarez-Manzo did not voluntarily consent to search of his wallet. Finally, the court concluded that the unconstitutional seizure of Alvarez-Manzo and his bag tainted the subsequent search warrant such that the evidence obtained pursuant it was inadmissible under the "fruit of the poisonous tree" doctrine.[5] The government brings this appeal.

## II.

"When reviewing a district court's grant of a motion to suppress, we review its factual findings for clear error and its application of law de novo." United States v. Ellis, 501 F.3d 958, 961 (8th Cir. 2007) (quotation omitted). The government challenges only two of the district court's determinations, asserting that: (1) Investigator Eberle did not seize Alvarez-Manzo's bag within the meaning of the Fourth Amendment and (2) Alvarez-Manzo voluntarily consented to the search of his wallet.

## A.

We first consider whether Investigator Eberle's removal of Alvarez-Manzo's bag from the cargo area of the bus to the bus's passenger seating area to locate the

---

[4]Miranda v. Arizona, 384 U.S. 486 (1966).

[5]"[T]he . . . question in . . . a ['fruit of the poisonous tree'] case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488 (1963) (quotation omitted).

bag's owner constituted a Fourth Amendment seizure. Because whether law enforcement's actions constitute a seizure within the meaning of the Fourth Amendment "involves a pure question of law," we review the district court's seizure decision de novo. United States v. Va Lerie, 424 F.3d 694, 700 (8th Cir. 2005).

The Supreme Court held in United States v. Jacobsen, 466 U.S. 109 (1984), that a Fourth Amendment "'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." Id. at 113. In Va Lerie, this court, en banc, applied Jacobsen in the context presented by this case–property entrusted to a third-party common carrier. Va Lerie, 424 F.3d at 701-03, 708 n.9. Va Lerie presents similar facts,[6] and, thus, this case turns on whether Va Lerie, in which the en banc court concluded that a seizure did not occur, id. at 708-09, is distinguishable from this case.

In Va Lerie, "Investigator Eberle asked a fellow law enforcement officer to remove [Va Lerie's] luggage from the bus and take it to a room inside the rear baggage terminal [of the Greyhound Bus Depot]." Id. at 696. After summoning Va Lerie to the bus station ticket counter, Investigator Eberle told Va Lerie that he was a law enforcement officer and explained to Va Lerie that he was not under arrest or in trouble. Id. at 697. Va Lerie agreed to speak with Investigator Eberle and follow him to the room where Va Lerie's luggage was being held. Id. There, Investigator Eberle explained that "he was a narcotics investigator who was watching for people who might be transporting illegal drugs." Id. Investigator Eberle then asked Va Lerie for consent to search the bag, and Va Lerie gave consent. Id. The search of Va Lerie's bag produced five vacuum-sealed bags containing cocaine. Id.

---

[6]We note that Va Lerie involved the same investigating officer and same bus station at issue in this appeal.

In Va Lerie, the en banc court determined that law enforcement's detention of property entrusted to a third-party common carrier constitutes a Fourth Amendment seizure only when the detention does any of the following: (1) "delay[s] a passenger's travel or significantly impact[s] the passenger's freedom of movement," (2) "delay[s] [the checked luggage's] timely delivery," or (3) "deprive[s] the carrier of its custody of the checked luggage." Id. at 707. The Va Lerie Court concluded that none of the factors were present and, as a result, held that no Fourth Amendment seizure occurred when law enforcement officials removed Va Lerie's bag from the bus and took it to a room inside the Greyhound Bus Depot's baggage terminal. Id. at 708-09. Alvarez-Manzo concedes that this case turns on the third Va Lerie factor, whether law enforcement deprived Greyhound of custody of Alvarez-Manzo's bag. See id. at 707.

With respect to the third Va Lerie factor, the en banc court stated that, in order "[t]o test the breadth of the carrier's custodial rights, we ask whether the government's actions go beyond the scope of the passenger's reasonable expectations for how the passenger's luggage might be handled when in the carrier's custody." Id. at 707 n.7. Applying this test to the facts before it, the Va Lerie Court determined,

> Va Lerie's possessory interests in his checked luggage certainly included an expectation that Greyhound-or others at Greyhound's request-would remove the luggage from the lower luggage compartment. *The NSP would have preferred to bring Va Lerie to the bus in the refueling area to seek permission to search, but Greyhound asked the NSP not to bring passengers to that area*. Thus, the NSP removed Va Lerie's checked luggage from the lower luggage compartment to a room inside the terminal *at Greyhound's request*. In doing so, the NSP never deprived Greyhound of its custody of Va Lerie's checked luggage.

Id. at 708 (emphasis added). The Va Lerie Court also observed:

> Here, the NSP never deprived Greyhound of custody of the checked luggage, at least not until Va Lerie consented to a search that unveiled

-9-

cocaine.  Indeed, the NSP adopted the policy of removing the luggage from the bus to present to the owner to seek consent to search *at Greyhound's prompting*.

Id. at 708 n.9 (emphasis added).

Here, in removing Alvarez-Manzo's bag from the bus's cargo area to the bus's passenger seating area to locate the bag's owner, Investigator Eberle was not acting at Greyhound's direction.  The government does not dispute this.[7]  Rather, the government argues that, if taking a bag to a room inside the bus station was not a seizure in Va Lerie, then taking a bag into the passenger section of the bus cannot constitute a seizure in this case.  However, this characterization of Va Lerie ignores the en banc court's discussion of the third factor which did not turn on *where* law enforcement took the bag but *at whose direction* law enforcement acted when it did so.  See id. at 708, 708 n.9.  In Va Lerie, law enforcement acted at Greyhound's request in taking Va Lerie's bag from the cargo area of the bus to a room inside the bus station.  Id.  Therefore, Va Lerie provides that law enforcement did not deprive Greyhound of its custody of Va Lerie's bag because, although law enforcement had

--------

[7]At oral argument before this court, the following exchange took place between the panel and counsel for the government:

Q.    Did Greyhound ask the agents to take this luggage anywhere?

A.    This luggage, sir.  Mr. Alvarez-Manzo's?

Q.    Yeah.

A.    No sir.

Audio Recording of Oral Argument at 16:19-16:26, United States v. Alvarez-Manzo, No. 08-2647 (8th Cir. Dec. 10, 2008).

physical possession of the bag, Greyhound was directing the action in terms of what law enforcement could do with Va Lerie's bag. Id.

In this case, the government concedes that Investigator Eberle took Alvarez-Manzo's bag into the passenger section of the bus of Investigator Eberle's own accord and *not* at the direction of Greyhound. See Audio Recording of Oral Argument at 16:19-16:26, United States v. Alvarez-Manzo, No. 08-2647 (8th Cir. Dec. 10, 2008). Because Investigator Eberle, not Greyhound, was directing the action with respect to Alvarez-Manzo's bag, this case is distinguishable from Va Lerie. In sum, Officer Eberle's actions deprived Greyhound of its custody of Alvarez-Manzo's bag. Thus, law enforcement seized Alvarez-Manzo's bag within the meaning of the Fourth Amendment. Such a seizure must be supported by reasonable suspicion. See United States v. Zacher, 465 F.3d 336, 338 (8th Cir. 2006) ("A law enforcement officer must have reasonable suspicion before he or she may seize a package for investigatory purposes."). The district court determined that law enforcement lacked reasonable suspicion to justify the seizure of the bag. The government does not challenge the district court's conclusion in this appeal. By failing to do so, the government has waived review of the reasonable suspicion issue. See Jeseritz v. Potter, 282 F.3d 542, 548 (8th Cir. 2002) (providing that where a party does not challenge a holding of the district court on appeal the party "waive[s] review of the . . . issue"). Accordingly, we hold that the seizure of Alvarez-Manzo's bag, without reasonable suspicion, violated his Fourth Amendment rights.

B.

The government also argues that the district court clearly erred in finding Alvarez-Manzo's consent to the search of his wallet involuntary. However, the government's challenge to this finding is insufficient to call into question the court's decision to grant the motion to suppress. The district court suppressed the evidence on the ground that Alvarez-Manzo's consent to search was involuntary. But Alvarez-

Manzo's bag and person were unlawfully seized *before* Investigator Eberle sought consent to search the wallet.[8] Thus, even if the consent to search was voluntary, standing alone, the evidence from the wallet still must be suppressed under the "fruit of the poisonous tree" doctrine unless the consent was sufficient to purge the taint of the unlawful seizure of Alvarez-Manzo's bag and person.

In a "fruit of the poisonous tree" doctrine case, a constitutional violation has occurred, and the issue is whether law enforcement obtained evidence "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488 (1963). "[V]oluntary consent to search, which was preceded by an illegal police action does not automatically purge the taint of an illegal [seizure]." United States v. Esquivel, 507 F.3d 1154, 1160 (8th Cir. 2007) (quotation omitted). Rather, to purge the taint, *i.e.* prevent the application of the "fruit of the poisonous tree" doctrine, the government bears the burden of demonstrating that the voluntary consent was an independent, lawful cause of the search. See United States v. Yousif, 308 F.3d 820, 830 (8th Cir. 2002). We determine whether this standard is met pursuant to the three factors elucidated in Brown v. Illinois, 422 U.S. 590 (1975), considering: (1) the temporal proximity between the Fourth Amendment violation and the grant of consent to search; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of the officer's Fourth Amendment violation. Id. at 603-04.

Here, the government does *not* argue or make any attempt to show that Alvarez-Manzo's voluntary consent purged the taint of the two, prior constitutional violations: (1) the seizure of his bag without reasonable suspicion and (2) the seizure of his

---

[8]The district court concluded that there was an unlawful seizure of Alvarez-Manzo's person on the bus. Because the government challenged the district court's seizure-of-the-person determination for the first time at oral argument, we do not consider this argument. See Cardinal Health 110, Inc. v. Cyrus Pharm., LLC, 560 F.3d 894, 902 n.5 (8th Cir. 2009).

-12-

person without reasonable suspicion. Because the government has failed to demonstrate that the causal connection between the illegal seizures and Alvarez-Manzo's consent was broken, the district court's denial of the motion to suppress is affirmed. See United States v. Reeves, 524 F.3d 1161, 1070-71 (10th Cir. 2008) (holding that the defendant's unlawful arrest in his hotel room rendered his subsequent consent to the search of his room invalid, even though he signed a consent form allowing the search after his arrest, because "[t]he government . . . completely failed to address whether there was a break in the causal relationship between the unlawful arrest and the subsequent search"). Accordingly, we do not reach the issue of voluntariness.

III.

For the reasons given, we affirm the district court's grant of Alvarez-Manzo's motion to suppress.

_____

-13-