# United States Court of Appeals
## For the Eighth Circuit
_____

No. 24-2158
_____

United States of America

*Plaintiff - Appellee*

v.

Donnale C. Clay

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: September 15, 2025
Filed: December 15, 2025
_____

Before SMITH, ARNOLD, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

A federal grand jury indicted Donnale Clay for possessing with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1), and for being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2). Before trial, Clay moved to suppress evidence officers seized from a suitcase and backpack belonging to him. The district court denied Clay's motion.

A jury later convicted Clay of simple possession of methamphetamine (a lesser included of the possession-with-intent-to-distribute offense), see 21 U.S.C. § 844, and of the firearms charge. Based on these convictions, the district court sentenced Clay to consecutive 24- and 120-month terms of imprisonment and imposed a $2,500 fine. On appeal, Clay challenges the district court's denial of his motion to suppress. He also contends that the district court erred procedurally at sentencing and imposed a substantively unreasonable sentence. Having jurisdiction under 28 U.S.C. § 1291, we affirm the district court's denial of Clay's motion to suppress. We also affirm Clay's sentence in part but vacate Clay's fine and remand for redetermination of that aspect of Clay's sentence.

I.

On the morning of April 27, 2022, six members of a Drug Enforcement Administration (DEA) task force were performing interdiction work at a Trailways bus station in Omaha, Nebraska. This task force—which was composed of both state and federal law enforcement officers—included Nebraska State Trooper Nicholas Jaworski and DEA Special Agent Christian Iten. While the task force apparently had no formal arrangement with Trailways (or another bus company that was operating out of the station), the task force regularly ran its interdiction operation at this location, visiting it five or six times per week. The task force's work generally involved identifying suspicious baggage and passengers and searching for contraband like drugs and weapons.

At around 5:55 a.m., a bus from Denver pulled into the station. The buses arriving in Omaha have two luggage storage areas: overhead compartments in their passenger areas, and compartments underneath for larger items. When a bus stops in Omaha, the doors to the lower storage area are opened so that passengers may access their bags. Although a baggage handler works at the Omaha station, the lower storage compartments are generally accessible to anyone when the buses are stopped. Passengers can and do remove their own and others' bags. The station's baggage handler also removes luggage that must be transferred to different buses.

On busier days, even luggage that will be continuing on with a given bus along its route may be temporarily removed. Trailways requires all its passengers to exit buses arriving at the terminal—including passengers continuing on to other destinations. Trailways keeps passengers off the buses for approximately 10 to 15 minutes (but sometimes up to around 30 minutes) while its drivers switch out.

When the Denver bus arrived, task force officers began looking for luggage of interest. They identified two suitcases—one of which belonged to Clay. Clay's suitcase piqued Trooper Jaworski's suspicion because it appeared to him to be relatively new. Trooper Jaworski removed Clay's suitcase from the bus's luggage hold and placed it on the pavement approximately three to five feet from the bus. It took Trooper Jaworski approximately five seconds to complete this maneuver. After taking Clay's suitcase off the bus, Trooper Jaworski stepped back against a wall and waited to see if any passenger would claim the suitcase.

Clay exited the bus and located his suitcase. As Clay approached it, Trooper Jaworski stepped forward and asked if it belonged to Clay. Trooper Jaworski then presented his badge, identified himself as a law enforcement officer, and informed Clay that Clay was neither in trouble nor under arrest. Special Agent Iten stood a few feet away next to the bus terminal's doors. Both Trooper Jaworski and Special Agent Iten wore plain clothes. While both were armed, neither of them visibly displayed their weapons.

After Clay confirmed to Trooper Jaworski that the suitcase was his, Trooper Jaworski asked Clay about his travel plans. Clay told Trooper Jaworski that he was traveling from Minneapolis, but then said he was traveling from Tacoma, Iowa. Trooper Jaworski challenged Clay on this claim, noting that the bus had not yet traveled through Iowa. Clay corrected himself and stated that he was traveling from Tacoma, Washington. Clay explained that he intended to visit family in Minnesota. Trooper Jaworski then asked how long Clay intended to remain in Minnesota. Clay responded that he might spend seven days there. He also stated that he had not made any plans for a return trip yet. Clay gave Trooper Jaworski his bus ticket and trip

itinerary, which showed that Clay's trip had begun in Spokane, Washington and that Clay's ultimate destination was St. Paul, Minnesota. Trooper Jaworski returned Clay's ticket.

Trooper Jaworski then analogized the task force's role to that of the Transportation Security Administration (TSA), explaining to Clay that the task force provided an added layer of security at the bus station. He then asked if he could search Clay's suitcase. Clay consented. Trooper Jaworski placed Clay's suitcase flat on the ground and began unzipping it. Clay bent down as if to assist. Then, he ran away. Trooper Jaworski yelled, "Runner!" to alert other members of the task force to Clay's flight. Trooper Jaworski attempted to pursue Clay, but he was still holding onto Clay's suitcase. The suitcase, which was partially unzipped, spilled. Trooper Jaworski gathered the items that had spilled out. As he did so, he felt a handgun through a soft case.

Other members of the task force tackled Clay, who sustained a leg injury. Task force officers then searched Clay's suitcase and located three handguns. They also searched a backpack Clay was wearing. This search yielded two packages of methamphetamine weighing around a pound and a half in total. It also yielded approximately 250 fentanyl pills. A search of Clay's person recovered additional contraband, including a few grams of marijuana and six fake fentanyl pills. Roughly 12 hours after Clay's arrest, he tested positive for benzodiazepines, cannabinoids, opiates, and oxycodone.

Clay moved to suppress the evidence the Government seized at the bus station. Clay argued that the task force unlawfully seized his suitcase from the bus's storage compartment without reasonable suspicion; that his initial contact with law enforcement was not consensual and that Trooper Jaworski lacked reasonable suspicion to detain him; that he did not validly consent to a search of his suitcase because his consent, such as it was, was offered involuntarily; and that the task force unlawfully seized him after he fled because it acted without reasonable suspicion.

-4-

After an evidentiary hearing, the magistrate judge recommended that the district court deny Clay's motion. The magistrate judge reasoned that: (1) Trooper Jaworski did not seize Clay's suitcase simply by removing it from the bus's lower storage area, (2) Trooper Jaworski's initial encounter with Clay was consensual (such that Trooper Jaworski didn't require reasonable suspicion), (3) Clay validly consented to a search of his suitcase, and (4) the task force officers validly seized Clay after he fled.

Clay objected to the magistrate judge's recommendation. The district court overruled Clay's objection, adopted the magistrate judge's report and recommendation in its entirety, and denied Clay's motion to suppress. In doing so, the district court noted that Clay "ha[d] filed no specific objections to [the magistrate judge's] conclusion that the suitcase was not seized, and that, therefore, no unlawful seizure occurred." Nevertheless, the district court conducted a de novo review of Clay's contention that Trooper Jaworski had unlawfully seized his suitcase and concluded that no Fourth Amendment seizure had occurred at all. The district court, like the magistrate judge, further found that Trooper Jaworski's initial encounter with Clay was consensual, that Clay validly consented to a search of his suitcase, and that the task force had reasonable suspicion to seize Clay when he fled.

At a jury trial, Clay testified in his own defense. He stated that he did not intend to distribute the roughly pound and a half of methamphetamine the task force had found in his backpack. According to Clay, this methamphetamine was for personal use only. The jury acquitted Clay of possession with intent to distribute but convicted him of the lesser-included offense of simple possession. The jury also convicted Clay of unlawfully possessing firearms.

Prior to sentencing, the United States Probation Office prepared a Revised Presentence Investigation Report (PSR), which found that Clay's Total Offense Level was 26 and that Clay's criminal record fell into Criminal History Category III. Thus, the PSR calculates Clay's United States Sentencing Guidelines imprisonment range as 78 to 97 months. The Government moved for an upward variance and

requested that the district court impose consecutive maximum sentences totaling 144 months' imprisonment.

The district court granted the Government's requested upward variance, ultimately sentencing Clay to consecutive sentences of 24 and 120 months' imprisonment. In doing so, the district court stated that it had considered the sentencing factors laid out in 18 U.S.C. § 3553(a). The district court emphasized Clay's lack of regard for the law as displayed by his trial testimony and that Clay had not been deterred from committing his offenses in this case despite "previously serv[ing] a significant federal sentence based upon his commission of drug-related offenses." The district court further noted that "when he was released from federal prison the last time, [Clay] violated the terms of his pretrial release" and "told his probation officer, quote, 'I'm not doing probation. Every time that I get out of prison I'm taking myself off -- back off probation. The judge knows it and my PO knows it.'"

The district court imposed a $2,500 fine on Clay in addition to the prison sentence. In doing so, it made no findings on Clay's ability to pay. Instead, the district court explained, "Because 21 U.S.C. Section 844(a) requires it, I am going to impose the mandatory minimum fine of $2500 that applies with respect to [Clay's simple possession conviction]." The PSR states that "it does not appear as if Mr. Clay has the ability to pay a fine in this matter." It also indicates that a credit report generated for Clay shows that he has no credit history, and that a financial affidavit states Clay has no assets or debts.

On appeal, Clay contends that the district court erred in denying his suppression motion for the same reasons he asserted before the magistrate judge and the district court. He also asserts that the district court made a procedural error by imposing the $2,500 fine on the assumption that a fine was mandatory and without making findings as to his ability to pay. Clay further contends that it was substantively unreasonable for the district court to impose consecutive maximum sentences.

II.

"A mixed standard of review applies to the denial of a motion to suppress evidence." United States v. Williams, 777 F.3d 1013, 1015 (8th Cir. 2015). We review the district court's findings of fact for clear error and its denial of Clay's suppression motion de novo. United States v. Green, 9 F.4th 682, 687 (8th Cir. 2021).

A.

Clay first argues that Trooper Jaworski seized his suitcase within the meaning of the Fourth Amendment when Trooper Jaworski moved the suitcase from the bus's cargo area to the pavement adjacent to the bus, that this purported seizure was unlawful because it was not supported by reasonable suspicion, see United States v. Zacher, 465 F.3d 336, 338 (8th Cir. 2006), and that this allegedly illegal seizure tainted the balance of the task force's investigation under the fruit-of-the-poisonous-tree doctrine. "Because a seizure decision involves a pure question of law, we review de novo the district court's" seizure decision. United States v. Va Lerie, 424 F.3d 694, 700 (8th Cir. 2005) (en banc).

The Fourth Amendment mandates that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. A Fourth Amendment "'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984). This rule's corollary is that "not all police interference with an individual's property constitutes a Fourth Amendment seizure." Va Lerie, 424 F.3d at 706. "[T]he seizure standard prohibits the government's conversion of an individual's private property, as opposed to the mere technical trespass to an individual's private property." Id. at 702. In sum, police may handle private property without necessarily seizing it—inconsequential contacts lack constitutional significance. See id.

In Va Lerie, we specified three factors that courts should focus on in determining whether law enforcement officers have meaningfully interfered with an owner's possessory interest in checked luggage entrusted to a carrier:

> First, did law enforcement's detention of the checked luggage delay a passenger's travel or significantly impact the passenger's freedom of movement? Second, did law enforcement's detention of the checked luggage delay its timely delivery? Third, did law enforcement's detention of the checked luggage deprive the carrier of its custody of the checked luggage?

Id. at 707. "If none of these factors is satisfied, then no Fourth Amendment seizure has occurred." Id. But if even one factor is satisfied, the luggage was seized. Id.

In this appeal, both parties assume that Clay's suitcase was checked luggage entrusted to the bus company—i.e., the parties have assumed that Va Lerie governs. However, the record does not conclusively show that Clay formally checked his suitcase and we note that Clay's suitcase was accessible to the general public when the bus was stopped. Nevertheless, Clay does not advance any argument that he had a greater possessory interest in his suitcase than that involved in Va Lerie. Cf. United States v. Hill, 805 F.3d 935, 938 (10th Cir. 2015) (recognizing that a property owner's possessory interest in a bag stowed in a generally accessible common luggage area "is intermediate between [the possessory interest he would have in] a bag in his direct possession and a bag checked with [a carrier]"). And in any event, the undisputed facts now before us are sufficiently similar to those at issue in Va Lerie for us to conclude Va Lerie applies. See Va Lerie, 424 F.3d at 696-97 (addressing law enforcement officers' actions in moving luggage from a bus's lower storage area into the bus terminal); see also United States v. Alvarez-Manzo, 570 F.3d 1070, 1075-77 (8th Cir. 2009) (applying Va Lerie in the context of law enforcement officers' actions in moving luggage from a bus's lower storage area to the bus's passenger compartment).

Clay argues only that the third Va Lerie factor resolves in favor of a seizure; he contends that Trooper Jaworski deprived Trailways of custody of his suitcase by removing it from the bus. Clay does not argue that Trooper Jaworski's removal of the suitcase delayed his or his suitcase's arrival at their intended destination or that Trooper Jaworski's removal of the suitcase significantly impacted his freedom of movement.

A luggage owner's reasonable expectations of how the carrier would handle his or her luggage define the scope of the carrier's custody: "[t]o test the breadth of the carrier's custodial rights, we ask whether the government's actions go beyond the scope of the passenger's reasonable expectations for how the passenger's luggage might be handled when in the carrier's custody." Va Lerie, 424 F.3d at 707 n.7; see also Zacher, 465 F.3d at 339 (applying this test in the context of a purported seizure at a FedEx facility). We have previously stated that:

> a commercial bus passenger who checks his luggage should reasonably expect his luggage to endure a fair amount of handling-if his luggage were not handled, it would not reach its destination. For instance, a commercial bus passenger's checked luggage must be sorted, loaded, rearranged, possibly transferred to another bus, and unloaded. The luggage may be damaged and require removal from the luggage compartment. If a bus breaks down, a passenger should expect his luggage to be removed from the luggage compartment and either transferred to another bus or taken inside the bus terminal.

Va Lerie, 424 F.3d at 706.

Here, Trooper Jaworski's actions—handling the suitcase for roughly five seconds and moving it between three and five feet away from the bus while the bus was stopped at the terminal—are consistent with how a reasonable passenger would have expected his or her luggage to be handled while in Trailways' custody. A reasonable passenger would anticipate that bus company employees or other passengers might remove luggage from the bus to access other bags after the bus has arrived at the terminal. This is the kind of routine handling that is part and parcel of

-9-

storing one's bag in a bus's luggage compartment during travel.  See id.; see also United States v. Ward, 144 F.3d 1024, 1032 (7th Cir. 1998) ("Hicks had surrendered custody of the bag to Greyhound and no doubt realized that the bag would be transported to Indianapolis in the common luggage compartment of the bus. . . .  He could have no reasonable expectation . . . that the bag would not be touched, handled, or even removed from the bus prior to the bag's arrival in Indianapolis.").  Because Trooper Jaworski did not handle Clay's suitcase in a manner different from what a reasonable passenger would anticipate, he did not deprive Trailways of custody of Clay's suitcase.  Thus, no seizure occurred.  See Zacher, 465 F.3d at 339 (holding that no change in custody occurred where a police detective placed a package on the floor of a FedEx facility "since a reasonable person could expect FedEx to handle his or her package the same way").

In an attempt to avoid this result, Clay relies on our decision in Alvarez-Manzo, in which we held law enforcement officers effected a Fourth Amendment seizure when they removed the defendant's bag from a bus's luggage area and walked the bag through the bus's passenger compartment to locate the bag's owner.  570 F.3d at 1075-76.  Clay points to language in this decision suggesting that the third Va Larie factor "d[oes] not turn on *where* law enforcement t[akes] the bag but at *whose direction* law enforcement act[s] when it d[oes] so."  Id. at 1076.  In Clay's view, because Trooper Jaworski was acting "as a criminal investigator, not as a bus passenger or baggage handler," Clay's suitcase left Trailways' custody when Trooper Jaworski moved it.

Clay's reading of Alvarez-Manzo goes too far.  If it were true that an officer seized luggage any time he moved it without a carrier's specific direction, incidental contacts between law enforcement officers and private property could rise to the level of seizures.  This would erase the distinction our cases have drawn between "the government's conversion of an individual's private property" and "the mere technical trespass to an individual's private property."  See Va Lerie, 424 F.3d at 702.  Moreover, the facts here differ significantly from those at issue in Alvarez-Manzo.  Trooper Jaworski moved Clay's luggage a few feet—but more

importantly, in a manner consistent with how a reasonable passenger would have expected his or her luggage to be handled. In Alvarez-Manzo, on the other hand, officers retrieved the defendant's bag from the bus's lower storage area, took it down the bus aisle, and asked each passenger whether the bag belonged to them. 570 F.3d at 1072. Alvarez-Manzo stands for the proposition that even this extensive handling might not have deprived the bus company of custody if the bus company had asked the officers to handle the defendant's bag in this way. But Alvarez-Manzo does not compel the conclusion that an officer seizes baggage when he or she handles it the way a reasonable person would expect it to be handled while in a carrier's custody. Alvarez-Manzo does not support Clay's argument that Trooper Jaworski seized his suitcase.

Because Trooper Jaworski's handling of Clay's suitcase comports with what a reasonable passenger would have expected, we hold that Trooper Jaworski did not take custody of Clay's suitcase and thus did not "seize" it within the meaning of the Fourth Amendment. And because no Fourth Amendment seizure occurred, no *unlawful* Fourth Amendment seizure occurred. We thus reject Clay's arguments that an initial illicit seizure of his suitcase tainted the remainder of the task force's investigation.

B.

Next, Clay argues that Trooper Jaworski unlawfully seized him before he fled. We review de novo whether an encounter constitutes a seizure. United States v. Grant, 696 F.3d 780, 784 (8th Cir. 2012). We conclude that Trooper Jaworski's initial contact with Clay was not a Fourth Amendment seizure—it was consensual.

"Government officials . . . 'do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.'" United States v. Lillich, 6 F.4th 869, 875 (8th Cir. 2021) (quoting United States v. Drayton, 536 U.S. 194, 200 (2002)). To determine whether a police-citizen

encounter is consensual, or is instead a Fourth Amendment seizure, we consider the totality of the circumstances and the unique facts of each case. Id. at 876. This analysis is guided by several factors, including:

> officers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation.

Id. (quoting United States v. Griffith, 533 F.3d 979, 983 (8th Cir. 2008)).

The district court found the following facts, which Clay does not contest: Trooper "Jaworski's position relative to Clay's did not prevent Clay from proceeding to the bus terminal or the exit"; "[w]hile law enforcement officers were in the vicinity, none were in close proximity to Clay or would otherwise prevent Clay from leaving"; and Trooper Jaworski was dressed in plain clothes, never revealed a weapon, spoke with Clay in a pleasant and non-confrontational tone, and told Clay he was neither in trouble nor under arrest.

On these facts, we agree with the district court that Trooper Jaworski's initial contact with Clay was consensual. See Drayton, 536 U.S. at 203-04 (finding no seizure occurred where "[t]he officers gave [bus] passengers no reason to believe that they were required to answer the officers' questions" and where the officer approaching the defendants "did not brandish a weapon or make any intimidating movements"; did not block the defendants' egress; and spoke in a polite, quiet voice); Lillich, 6 F.4th at 876-77 (concluding that an initial encounter between law enforcement officers and a suspect in a car wash bay was consensual where the officers did not brandish weapons, did not threaten arrest, and did not block the suspect from leaving the bay). We thus reject Clay's argument that Trooper Jaworski's initial contact with him was an illegal seizure and that evidence ought to have been suppressed on that basis.

C.

Clay also argues that he did not voluntarily consent to Trooper Jaworski searching his suitcase and that the search was thus unlawful. The Fourth Amendment does not prohibit warrantless searches conducted pursuant to the knowing and voluntary consent of the person subject to the search. United States v. Garcia-Garcia, 957 F.3d 887, 892 (8th Cir. 2020). "The voluntariness of a consent to a search is a factual question that is reviewed for clear error." United States v. Saenz, 474 F.3d 1132, 1136 (8th Cir. 2007). "We will reverse a finding of fact for clear error only 'if, despite evidence supporting the finding, the evidence as a whole leaves us with a definite and firm conviction that the finding is a mistake.'" United States v. Holly, 983 F.3d 361, 363 (8th Cir. 2020) (citation omitted).

We are not persuaded that the district court clearly erred in finding that Clay voluntarily consented to Trooper Jaworski's search of his suitcase. The district court acknowledged factors that we have recognized as instructive on the question of whether consent is voluntary, including:

> the defendant's age, education, intelligence, sobriety, and experience with the law; and . . . context . . . , such as the length of . . . questioning, the substance of any discussion . . . preceding the consent, whether the defendant was free to leave . . . , and whether the defendant's contemporaneous reaction to the search was consistent with consent.

Garcia-Garcia, 957 F.3d at 896-97 (alterations in original) (citation omitted).

Consistent with these factors, the district court made findings, including that: (1) Trooper Jaworski conversed with Clay in a public area; (2) Trooper Jaworski's encounter with Clay was conversational and nonthreatening; (3) Trooper Jaworski did not display a weapon or otherwise attempt to intimidate Clay; (4) Clay was 38 years old at the time of the encounter, and had interacted with law enforcement and the criminal justice system frequently; and (5) Clay's response to Officer Jaworski's

-13-

request to search Clay's suitcase was consistent with someone giving voluntary consent. None of these findings is clearly erroneous.

The district court acknowledged that Clay had later tested positive for drugs, that Trooper Jaworski had not informed Clay that he had the right to refuse to consent to a search, and that Trooper Jaworski, by likening his role to that of a TSA agent at an airport, arguably misrepresented his authority. But it reasoned that some of the drugs in Clay's system may have been introduced after Clay's arrest when Clay underwent medical treatment for his injured leg and that Clay did not display signs of intoxication when he spoke with Trooper Jaworski—a fact that is significant because a voluntariness analysis depends "not [on] whether the defendant subjectively meant to consent, but whether [his] conduct would cause a reasonable person to believe [he] consented to the search." United States v. Alloway, 25 F.4th 1093, 1096 (8th Cir. 2022). The district court further (and correctly) observed that while "being informed of the right to refuse consent is . . . relevant to . . . whether Clay gave voluntary consent" it is "not dispositive" on that question. See United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000) (directing that the factors in a voluntariness analysis "should not be applied mechanically" and that "no single factor is dispositive or controlling"). Finally, the district court found that there was no evidence that Clay relied on Trooper Jaworski's TSA analogy when he gave Trooper Jaworski consent to search his suitcase.

On balance, the factors we have identified for gauging the voluntariness of consent cut in favor of a voluntariness finding. See United States v. Puckett, 139 F.4th 730, 742 (8th Cir. 2025) (holding that the district court did not clearly err in finding that the defendant voluntarily consented to a search where the defendant was 36 years old; had previous experience with the criminal justice system; was not subjected to threats, physical intimidation, or punishment; was not impaired; responded and interacted with law enforcement in a way that showed he understood officers' questions; and was detained only briefly); Garcia-Garcia, 957 F.3d at 897-98 (determining that the district court did not clearly err in finding consent voluntary where law enforcement approached the defendant at a crowded bus

-14-

station, the defendant was 26 years old and appeared sober, and the defendant was of sound mind and average intelligence). We acknowledge that some facts cut against a voluntariness finding, including in particular Trooper Jaworski's analogizing of his role to that of a TSA agent and Trooper Jaworski's failure to advise Clay that Clay did not have to provide his consent. Cf. United States v. Escobar, 389 F.3d 781, 786 (8th Cir. 2004) (concluding that the district court did not clearly err in finding that the defendants' consent to search their bags was not voluntarily given where law enforcement officers misrepresented their authority to conduct a search). But, from the totality of the circumstances, we are not left with a definite and firm conviction that the district court made a mistake in concluding that Clay's consent was voluntary. We therefore reject Clay's challenge to the district court's voluntariness finding and his argument that evidence ought to have been suppressed on the basis of his purportedly involuntary consent.

D.

Clay's final suppression argument is that task force officers unlawfully seized him after he fled from Trooper Jaworski. While Clay's briefing on this issue is not entirely clear, Clay's primary contention seems to be that the district court erred in concluding that the task force officers had reasonable suspicion to detain him. "A police officer may conduct an investigative stop if she 'has a reasonable suspicion supported by articulable facts that criminal activity may be afoot.'" United States v. Roberts, 787 F.3d 1204, 1209 (8th Cir. 2015) (citation omitted). "The existence of reasonable suspicion is a mixed question of law and fact that [we] review de novo." United States v. Thabit, 56 F.4th 1145, 1149 (8th Cir. 2023).

We have little trouble concluding that the task force possessed reasonable suspicion sufficient to detain Clay after he consented to Trooper Jaworski's search of his suitcase and then immediately fled. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); United States v. Hightower, 716 F.3d 1117, 1121 (8th Cir. 2013)

-15-

("Although simply ignoring the police cannot be the basis for reasonable suspicion, conduct beyond merely ignoring, such as attempting to flee, can create reasonable suspicion to support a <u>Terry</u> stop."); <u>United States v. Thompkins</u>, 998 F.2d 629, 633 (8th Cir. 1993) (recognizing that the defendant's nervousness, failure to answer questions about work history, and lies about not having any checked luggage might not have given law enforcement an adequate reason to detain the defendant, but concluding that "the added fact of [the defendant's] sudden flight . . . gave rise to a legitimate suspicion that [the defendant] was engaged in criminal activity"). Clay's contention that officers unlawfully detained him without reasonable suspicion post-flight is meritless, and we reject Clay's argument that any evidence should have been suppressed on this basis.

### III.

Clay also challenges his sentence, contending that the district court erred procedurally by imposing a $2,500 fine without making findings as to his ability to pay and substantively by sentencing him to consecutive maximum terms of incarceration. "We review a district court's sentence in two steps: first, we review for significant procedural error; and second, if there is no significant procedural error, we review for substantive reasonableness." <u>United States v. O'Connor</u>, 567 F.3d 395, 397 (8th Cir. 2009); <u>see also</u> <u>United States v. Jones</u>, 612 F.3d 1040, 1044-45 (8th Cir. 2010) (explaining what constitutes a procedural error and the standard for evaluating substantive reasonableness).

### A.

Clay first challenges his sentence on the ground that the district court erroneously imposed the $2,500 fine without making findings as to Clay's ability to pay. "A district court's imposition of a fine and the determination of the amount of the fine will not be reversed unless clearly erroneous." <u>United States v. Allmon</u>, 500 F.3d 800, 807 (8th Cir. 2007) (citation omitted). "Because [Clay] did not object at the [sentencing] hearing, this court 'cannot reverse the district court unless its actions

are plain error.'" Id. (citation omitted). This means that Clay must show (1) an error, (2) that is plain, and (3) that affects substantial rights. United States v. Wohlman, 651 F.3d 878, 884 (8th Cir. 2011). Even if Clay makes this showing, "we may exercise our discretion to correct a forfeited error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (citation omitted).

The district court reasoned that the statute governing the penalties for Clay's simple possession conviction, 21 U.S.C. § 844(a), "require[d]" it to "impose the mandatory minimum fine of $2500" on Clay. But it is not necessarily true that § 844(a) required the district court to impose a fine. While § 844(a) provides that a person with Clay's criminal history "shall be fined a minimum of $2,500," it goes on to say that "a fine under this section need not be imposed if the court determines under the provision of Title 18 that the defendant lacks the ability to pay." Thus, in concluding that the $2,500 fine was "required," the district court either (a) misread the statute, or (b) determined that Clay had the ability to pay the fine.

If the former, we would conclude that the district court committed a plain error affecting Clay's substantial rights and the fairness of the district court proceedings. If the latter, we would reach the same conclusion, because the district court did not explain (and likely could not explain) its reasoning. The district court made no findings as to Clay's ability to pay. But "[s]uch findings are mandatory." United States v. Van Brocklin, 115 F.3d 587, 602 (8th Cir. 1997); see also United States v. Morais, 670 F.3d 889, 894 (8th Cir. 2012) ("The court should make findings regarding the defendant's ability to pay . . . ."); United States v. Patient Transfer Serv., Inc., 465 F.3d 826, 827 (8th Cir. 2006) ("A sentencing court must make specific factual findings on the record demonstrating that it has considered the defendant's ability to pay the fine."). While we have held that a "district court d[oes] not commit plain error in imposing a fine when [the defendant] d[oes] not establish that he cannot pay the fine, and the record indicates his ability to pay it," Allmon, 500 F.3d at 808, the record as it stands indicates that Clay *does not* have the ability to pay a fine. Per the PSR, "it does not appear as if Mr. Clay has the ability to pay a

-17-

fine in this matter." If the district court had made the required findings as to Clay's ability to pay, we think on this record, and where the district court's sole reason for imposing a fine was its view that a fine was required, there is "a reasonable probability that . . . [Clay] would have received a more favorable sentence." United States v. Isler, 983 F.3d 335, 343 (8th Cir. 2020) (citation omitted). The bottom line is that, if the district court imposed a fine *based* on Clay's ability to pay, we require findings to that effect. And the plain-error standard of review does not excuse this requirement when the record reflects the defendant's inability to pay.

Ultimately, "[b]ecause the record does not reflect" the district court's basis for imposing Clay's fine "we are unable to provide meaningful appellate review. Therefore, we conclude that we must vacate [Clay's] fine and remand for redetermination of this portion of [his] sentence." United States v. Kay, 717 F.3d 659, 666 (8th Cir. 2013) (third alteration in original) (citation omitted).

B.

Clay also challenges the term of his imprisonment, contending that it was substantively unreasonable for the district court to grant the Government's requested upward variance and impose consecutive maximum sentences. In Clay's view, his offense conduct was "routine" and "nonviolent" and thus "fully accounted for in the United States Sentencing Guidelines." Clay speculates that he received consecutive maximum sentences because the district court sought to punish him for possession with intent to distribute—i.e., conduct the jury acquitted him of. While Clay "concedes the district court stated its reasons for granting the variance motion and its rationale for consecutive sentences," Clay believes the district court's reasoning is weak because his conduct is not as bad as that of other offenders with the same convictions and because the district court placed too much weight on certain sentencing factors.

"When we review the imposition of sentences, whether inside or outside the Guidelines range, we apply 'a deferential abuse-of-discretion standard.'" United

-18-

States v. Feemster, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (citation omitted). A district court abuses its discretion when it: (1) "fails to consider a relevant factor that should have received significant weight," (2) "gives significant weight to an improper or irrelevant factor," or (3) "commits a clear error of judgment in weighing" the appropriate factors. United States v. McCauley, 715 F.3d 1119, 1126-27 (8th Cir. 2013). The district court "has wide latitude to weigh the [18 U.S.C.] section 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." United States v. Richart, 662 F.3d 1037, 1054 (8th Cir. 2011) (citation omitted). "[I]t will be the unusual case when we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable." Feemster, 572 F.3d at 464 (citation omitted). In evaluating whether a variance is substantively reasonable, "we 'may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance.'" Id. at 461-62 (citation omitted). "We review a district court's decision to impose a consecutive or concurrent sentence for reasonableness, and we apply the same deferential abuse-of-discretion standard that governs a reasonableness determination under § 3553(a)." United States v. Nelson, 982 F.3d 1141, 1146 (8th Cir. 2020) (citation omitted).

The district court did not abuse its discretion in sentencing Clay to consecutive maximum sentences. The record shows that the district court considered and appropriately weighed the relevant factors when determining Clay's sentence. The district court expressly stated that it "collectively consider[ed] all factors under 18 U.S.C. Section 3553(a)." In fashioning Clay's sentence, the district court emphasized Clay's trial testimony, noting that it was striking how little respect Clay appears to have for the law. Moreover, the district court focused on Clay's criminal history and the apparent failure of a significant earlier sentence to deter Clay from engaging in criminal behavior, along with Clay's record of noncompliance on pretrial release in an earlier criminal prosecution and comments Clay made expressing his attitude towards probation. Promoting respect for the law and the

need for deterrence are valid reasons for the district court to have imposed the sentence it did.

Clay's argument that worse offenders exist and his disagreement with the weight the district court assigned to particular factors in its sentencing analysis do not require us to find an abuse of discretion. See United States v. Anderson, 926 F.3d 954, 958 (8th Cir. 2019) ("We do not require district courts to compare the defendant with other similarly situated prior offenders, and we will uphold a sentence if, as here, 'the district court's justifications for imposing a . . . sentence "rest on precisely the kind of defendant-specific determinations that are within the special competence of sentencing courts."'" (alteration in original) (citation omitted)); Richart, 662 F.3d at 1054 ("Simply because the district court weighed the relevant factors more heavily than [the defendant] would prefer does not mean the district court abused its discretion."). Clay's passing suggestion that acquitted conduct motivated his sentence likewise does not establish an abuse of discretion. The record does not reflect that the district court considered any acquitted conduct. But even if the district court had, that would not be error. See, e.g., United States v. Chambers, 878 F.3d 616, 622 (8th Cir. 2017) (recognizing that a "district court may consider uncharged, dismissed, and even acquitted conduct at sentencing"). Because we perceive no abuse of discretion, we affirm Clay's prison sentence.

IV.

We affirm the district court's denial of Clay's motion to suppress. Moreover, we affirm the custodial portion of Clay's sentence. We vacate Clay's fine and remand for redetermination of that aspect of Clay's sentence.

_____